Maria Alejandra Ramirez Rodriguez and Cristian Ramirez Guzman, individually and as next friends of their minor son, IR

Plaintiffs

vs.

Nancy Sanders Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; Otto Bremer Trust; The University of Minnesota Physicians d/b/a U of M Physicians; the University of Minnesota Foundation d/b/a U of M Foundation; Nicole Christenson; Maria Kroupina, PhD; Megan Dillman, MD; and Jacob Christensen.

                    Defendants.

_____

Case No.  25-cv-2266

**COMPLAINT**

**JURY TRIAL DEMANDED UNDER FED. R. CIV. P. 38(b)**

FOR THEIR COMPLAINT AND JURY DEMAND,  Maria Alejandra Ramirez Rodriguez and

Cristian Ramirez Guzman, individually and as next friends of their minor son, IR, by and

through counsel, the Law Offices of J.M. Reinan, PC, state and allege against Nancy Sanders

Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the

University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; The Otto Bremer Trust; University of Minnesota Physicians d/b/a UMP; University of Minnesota Foundation d/b/a U of M Foundation; Nicole Christenson; Maria Kroupina, PhD; Jacob Christensen; and Megan Dillman, MD, as follows:

## I.    **INTRODUCTION**

1.    This suit is brought to redress the unconstitutional, unlawful, fraudulent and secret policies, procedures, customs and practices that form the very basis of the Hennepin County child abuse protection system.

2.    On May 10, 2023, baby IR, who was then only six weeks old, was removed from his parents and placed in foster care based on a combination of Defendant Nancy Sanders Harper, MD's fraudulent allegations of child abuse and the institutional defendants' unconstitutional policies, procedures, customs and practices that forbid its other doctors from collaborating and/or documenting medical opinions that differ from Harper's.

3.    These secret and unconstitutional policies, procedures, customs and practices promoting the fabrication, destruction, tampering and omission of medical evidence tending to exonerate accused child abusers were created by Defendant Harper and her associates and implemented by the institutional defendants in order to ensure that the institutional defendants continue to enjoy substantial public support and financial funding at the expense of the very persons they pretend to protect.

4.    The wrongful conduct described in this Complaint involves not only manipulation of medical evidence and testimony but also includes academic fraud by and through the creation of falsified medical data and studies that Harper and the institutional Defendants use to secure false child abuse prosecutions and convictions through false court opinions and testimony, thus

promoting their unlawful and money-making child abuse enterprise.

5. Harper and the institutional defendants' decisions to favor their own personal, academic, financial and institutional wellbeing over those of sick babies, parents, families and caregivers of sick children has resulted in a situation where parents and caregivers who bring sick or injured children to a Hennepin County or University of Minnesota-staffed medical facility for treatment of bruises, clotting disorders, connective disorders, head injuries or broken bones run the real risk of having their babies taken from them while being unjustly prosecuted for child abuse.

6. Because of Harper's and the institutional defendants' unconstitutional intransigence, as described in greater detail below, Plaintiffs' remaining remedy is to seek this Court's intervention to not only compensate the family for its continuing injuries and losses, but to force these institutional Defendants to protect families, children and caregivers rather than treat them as financial, academic and political pawns.

## II. JURISDICTION

7. This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1988; and 18 U.S.C. § 1961 *et seq.* The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

8. This case is instituted in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

9. Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a

common nucleus of operative facts.

### III.    PARTIES AND VENUE

10.    Plaintiffs Maria Alejandra Ramirez Rodriguez, "Maria," and Cristian Ramirez Guzman, "Cristian," are the natural parents of their minor son, IR, who was born in March, 2023.

11.    Plaintiffs bring this suit individually and as next friends of IR, who is a minor.

12.    Defendant Nancy Sanders Harper, MD ("Harper") is a pediatrician with a sub certificate in child abuse pediatrics.

13.    Harper is a resident of Minnesota and citizen of the United States of America acting within the scope and course of her employment and under color of state law.

14.    Harper is the Child Abuse Pediatrics Fellowship Program Director and a Professor of Pediatric Emergency Medicine within the Department of Pediatrics at the University of Minnesota, which is owned and operated by the Defendant Board of Regents of the University of Minnesota.

15.    Defendant Board of Regents of the University of Minnesota is the University's governing body and "body corporate . . . with the right as such, of suing and being sued." Minn. Laws 1851, cl. 3, § 7; *see also Miller v. Chou*, 257 N.W.2d 277, 278 (Minn. 1977). The Board of Regents consists of twelve members elected pursuant to Minn. Stat. § 137.0246.

16.    The Board is sued pursuant to *Ex parte Young*, 209 U.S. 123 (1908), for acting under color of state law. For the purposes of this lawsuit, the Defendant Board of Regents of the University of Minnesota will be referred to as "U of M".

17.    U of M is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, and training with respect to its Child Abuse Pediatrics Fellowship Program, the diagnosis of child abuse in pediatric populations

presenting to HH and Children's, which resides on the U of M campus, and other entities supervised and overseen by physicians employed by the U of M, UMP, as well as its forensic services and participation/oversight of persons accused of child abuse. The U of M is also sued for its fraudulent advertising and marketing practices.

18.     Harper is also the Medical Director of the Otto Bremer Trust Center for Safe & Healthy Children ("The Center"), a sub department of the U of M Department of Pediatrics.

19.     The Center was created by, is managed by and is funded by Defendant Otto Bremer Trust, "Bremer."

20.     The Center is operated, medically staffed and supervised by UMP and is located at M Health Fairview Masonic Children's Hospital in Minneapolis, ("Fairview"), which is jointly owned and/or operated by Defendant Fairview Health Services and the U of M.

21.     Bremer, U of M and Fairview advertise and promise that:

a.      The Otto Bremer Trust Center for Safe and Healthy Children at M Health Fairview Masonic Children's Hospital is dedicated to providing medical care for victims and potential victims of child abuse and neglect.

b.      The M Health Fairview Masonic Children's Hospital is Minnesota's only university-affiliated pediatric hospital engaged in leading research with the potential to radically improve the way we care for critically ill children.

c.      Our strength stems from the relationship with the children's hospital and the department's pediatric research experts who continually develop new therapies, sharing their best available treatments with patients.

d.      Care is provided through "teamwork and collaboration" between medical professionals.

22.     Bremer created and funds Harper's position within the Hennepin County child abuse protection system and is responsible for placing and keeping Harper in her ultimate position of unsupervised authority, as described further below, and for tolerating and ratifying her continuing unlawful conduct.

23.     Bremer also effectively monetizes the prosecution of alleged child abusers by and through its numbers-based grants and donations to various U of M entities.

24.     Harper is co-employed by Defendant University of Minnesota Physicians "UMP." UMP employs, trains and supervises some or all of the members of the medical staff at several major acute care hospitals in Hennepin County, including Hennepin Healthcare, f/k/a Hennepin County Medical Center, herein "HH" and Fairview.

25.     UMP also directs and supervises clinical care at HH and Fairview and is part of Hennepin County's child abuse program.

26.     UMP provides HH and Fairview with policies, procedures, protocols and customs followed by physicians and staff at both HH and Fairview.

27.     UMP and U of M contract with Defendant Hennepin County to provide child abuse services at HH and Fairview. Upon entering into formal and informal agreements to provide diagnostic services, oversight and forensic services to Hennepin County, Fairview and HH, Defendants U of M and UMP assumed public and county functions, acted under color of state law, and are legally responsible to comply with all requirements of the United States Constitution.

28.     Harper is an agent of and/or co-employee of Hennepin County, where she acts as an agent and/or consultant for the Hennepin County.

29.     In these roles, Harper:

a.   Generates and supervises the creation of medical evidence used in child abuse prosecutions in criminal court, child protective services actions in civil court, and maltreatment actions in administrative court in Hennepin County;

b.   Edits and manipulates medical evidence generated by physicians assigned to diagnose and treat suspected victims of child abuse;

c.   Supervises and directs Hennepin County child abuse employees;

d.   Edits and manipulates evidence generated by Hennepin County child abuse employees;

e.   Supervises and directs law enforcement officials and investigators; and

f.   Supervises and directs investigative employees of the Hennepin County Attorney's Office, "HCAO."

30.   Harper has privileges to practice medicine at HH and Fairview.

31.   Hennepin County employs, funds and supervises all child abuse workers, social workers and the investigators and attorneys of the HCAO to bring civil child abuse suits in juvenile court. Hennepin County participates in, ratifies and directs child abuse identification and prosecution policies within the defendant medical institutions. Hennepin County acts under color of state law.

32.   Defendant U of M Foundation is a 501(c)(3) nonprofit corporation owned, operated and/or a subsidiary agency of the U of M. U of M Foundation receives grants and donations from Bremer on behalf of The Center and distributes those monies to its various subsidiary business entities, including UMP, and, ultimately, Defendant Harper. In this role the U

of M Foundation participates in, ratifies and directs child abuse identification and prosecution policies within those institutions.

33.     At times relevant, Defendant Nicole Christenson, "Christenson," was a nurse and foster parent of IR. Christenson is a resident of Minnesota and citizen of the United States of America.

34.     At times relevant, Defendant Maria Kroupina, PhD, "Kroupina," was a psychologist on staff of the University of Minnesota Medical School and an employee of UMP. Kroupina is a resident of Minnesota and citizen of the United States of America at times acting within the scope and course of her employment and under color of state law.

35.     At times relevant, Defendant Jacob Christensen was a child abuse social worker employed by Hennepin County.

36.     At times relevant, Defendant Megan Dillman, MD, "Dillman," was IR's foster parent.

37.     Under Minnesota law, Hennepin County is vicariously liable for the acts and omissions of its agents and employees, including Harper, Kroupina, Christensen, Price and agents of the HCAO.

38.     UMP is vicariously liable for the acts and omissions of its agents and employees, including Harper and Kroupina.

39.     U of M is vicariously liable for the acts and omissions of its agents and employees, including Harper and Kroupina.

40.     HH is vicariously liable for the acts and omissions of its agents and employees, including Harper and HH's medical staff.

### IV.     <u>FACTUAL BACKGROUND</u>

**<u>Development of "Shaken Baby Syndrome" and the resulting development of the subspecialty of Child Abuse Pediatrics</u>**

41.     Shaken Baby Syndrome ("SBS/AHT") is an unproven, unscientific medical diagnosis that ultimately spurred the development of an entire child abuse enterprise as well as the medical subspecialty of child abuse pediatrics.

42.     The underlying hypothesis of SBS/AHT was first suggested by British neurosurgeon Norman Guthkelch in 1971. Dr. Guthkelch studied thirteen cases of infants with subdural hematomas and found that five of those cases demonstrated no external injuries. Dr. Guthkelch theorized that the intracranial findings in those infants could have been caused by shaking. He cited to an observation study of Dr. Ayub K. Ommaya in which monkeys were subjected to sudden accelerative/decelerative forces.  Dr. Ommaya's paper on monkeys was the only source of experimental data upon the which the original hypothesis was based.

43.     In 1984, Ludwig and Warman published a paper titled, *Shaken Baby Syndrome: A Review of 20 Cases.* In this review, the authors examined twenty cases of children who were reported as victims of child abuse. Of 1,250 children referred to Child Protective Services, "CPS," 20 met the criteria for SBS/AHT. 14 were boys and 6 were girls, ranging in age from one to 15 months.

44.     Of the 20 cases reviewed by Ludwig and Warman, 16 children had their head circumferences measured. Nine children were identified with head circumference, "HC" measurements greater than the 90th percentile, and eleven children had a full or bulging anterior fontanelle (soft spot on an infant's head that closes between 4 and 26 months of age.)

45.     15 children were subject to funduscopic examinations. 12 were positive for retinal hemorrhages (3/15 unilateral, 12/15 bilateral.) All 20 children were subject to computed cranial tomography ("CT") scans. Ten children were identified with subdural hemorrhages, eight with

cerebral contusions, and five with subarachnoid hemorrhages.

46. Of the 20 cases reviewed, 3 children died, and 10 children had significant morbidity including blindness, visual impairment, motor impairment, seizures, and developmental delay.

47. Ludwig and Warman concluded from the analysis of this data that HC measurements in the 90+ percentiles were an early indicator of SBS/AHT caused by behavioral corrective efforts by parents and caregivers over time that produced cumulative morbidity and potentially death.

48. In other words, these researchers concluded that shaking a baby's head, over time, would result in excessive head growth, "macrocephaly," and ultimately sickness or death.

49. In 1993, the American Academy of Pediatrics ("AAP") published its first official statement on the SBS/AHT "triad" of injuries.

50. The AAP instructed physicians to assume SBS/AHT had occurred notwithstanding the absence of external injuries or caregiver reports of accidental events and/or natural disease process.

51. The AAP also recommended that teams of specialists be formed for the specific task of working with children suspected to be victims of SBS/AHT. These teams were to be led by a new forensic subspecialty known as the child abuse pediatrician, "CAP." The CAP would lead a team of forensic physicians comprised of pediatric radiologists, neurologists, neurosurgeons and ophthalmologists. In that moment, the modern child abuse enterprise was born.

52. In its 1993 statement, the AAP instructed that SBS/AHT symptoms may not be immediately identifiable. Supporting Ludwig and Warman's view that SBS/AHT was often the

result of repeated shaking over time – and demonstrated by head circumferences above the 90th percentile -- the AAP characterized SBS/AHT as equally likely to present with gradual or subtle symptoms such as poor feeding, vomiting, lethargy and irritability over days and weeks.

53.     Around this same time, a three-year nationwide campaign was launched to raise public awareness about "Shaken Baby Syndrome."

54.     After the AAP statement and media blitz, criminal allegations and prosecutions of SBS/AHT soared.

55.     Prior to 1990, only fifteen cases of alleged SBS/AHT reached the appellate courts. Between 1990 and 2000, over two hundred SBS/AHT cases reached the appellate courts, and between 2000 and 2010, there were over eight hundred such SBS/AHT cases.

56.     Although Dr. Guthkelch originally theorized the shaking mechanism within the context of medical care, SBS/AHT had been commandeered by state and local prosecutors for the purpose of criminal prosecution.

57.     In 2001, the AAP published a paper that gave rise to the most current SBS/AHT theory that governs the testimony of CAPs nationwide. Contrary to its position in 1993, the AAP then proclaimed that the clinical signs of SBS/AHT "…are immediate and identifiable as problematic even to parents who are not medically knowledgeable."

58.     This new position also effectively scrapped the previous medical studies demonstrating that SBS/AHT usually involved a prolonged process of shaking that manifested itself through abnormal enlargement of the baby's head.

59.     In 2009, the AAP released yet another policy statement, this acknowledging the problems inherent to the term "shaken baby syndrome." In this statement, AAP recommended the use of the term "abusive head trauma" as an alternative. At that moment, SBS/AHT was born.

60. In the Consensus Statement on Abusive Head Trauma in Infants and Young Children (2018), the term AHT is used as a synonym for all forms of child abuse, for SBS/AHT and as an umbrella term containing all mechanisms of physical abuse to the head including SBS/AHT.

61. Despite the fact that the SBS/AHT hypothesis was never proven to be a reliable medical diagnosis through peer reviewed testing and biomechanical analysis, it was rapidly adopted as a standard for prosecuting infant brain injuries in the absence of obvious external traumatic findings for a number of reasons – many of which have little or nothing to do with child abuse or the prosecution of actual child abusers.

62. Rather, the SBS/AHT hypothesis became popular because it became an easy route for securing child abuse convictions. Development and use of the SBS/AHT hypothesis also became politically important, given the overwhelming public distaste over child abuse injuries and deaths, especially after the early 1990s media campaign.

63. SBS/AHT is popular with prosecutors because it provides them with a rare "magic bullet."

64. Testimony from a single pediatric abuse expert can prove all elements of the crime of child abuse resulting in death or serious injury, including the manner of death, the identity of the assailant or killer, and the perpetrator's intent. Thus, if a baby or young child presents to the hospital with the triad of injuries – and nothing else – all that remains for the prosecution to do is identify the last person with the baby prior to the onset of the severe symptoms of traumatic brain injury, and that person will often go to prison.

65. The SBS/AHT hypothesis is also attractive to prosecutors because it effectively lowers the state's burden of proof.

66. An abuse investigation is comprised of three parallel investigations: a maltreatment investigation, a child abuse investigation, and a criminal investigation. The consequences of a maltreatment investigation is often a maltreatment finding.

67. Once a person is found to have maltreated a child they are placed on a central registry disqualifying them from most licensed jobs and volunteering, adopting or fostering children, and some housing. Maltreatment findings are conducted outside the court process at a preponderance standard.

68. Child abuse cases are often tried initially in juvenile court, where a clear and convincing standard applies. Thus, when a person is accused of causing injury to a child, prosecutors can strategically opt to bring a juvenile court proceeding first.

69. The juvenile court typically does not assign experts, and as a result, the prosecutor is able to essentially develop the state's case without much pushback from the underfunded juvenile court defendant. Often, defendants and their family resources are exhausted on juvenile matters, leaving no money for criminal defense and, more importantly, defense medical experts when charges are finally levied.

70. Child abuse prosecutions are also wildly successful because of the development of what amounts to a child abuse enterprise.

71. Over the years, lobbying and publicity efforts by child abuse proponents – including child abuse pediatricians, prosecutors and child welfare caseworkers – has resulted in significant public funding and what amounts to a financial, political and medical machine built on identifying and prosecuting child abuse.

72. Medical schools at colleges and universities across the county have created departments that teach and validate SBS/AHT and other child abuse diagnoses and hypotheses.

State legislation has prescribed the mandatory formation of multidisciplinary teams ("MDT") tasked with finding and prosecuting child abuse. Massive marketing campaigns have taught the public about the scourge of SBS/AHT and other forms of child abuse.

73. Thus, even if a person accused of child abuse has money, she faces a well-organized public-private partnership of highly credentialed child abuse pediatricians who are actually by design partnered with the prosecution and backed by massive public funding and a longstanding public relations campaign – and who use this power to convince juries that the abuse most certainly occurred, even if the medical evidence is flimsy or sometimes nonexistent.

74. Moreover, the child abuse enterprise has made child abuse pediatricians so intertwined within the prosecution process that they are often the ones causing the prosecutions – as is the case in Hennepin County.

75. While child abuse prosecution teams have what amounts to unlimited resources, the overwhelming majority of defendants do not have the money or resources necessary to rebut the power, politics, money and reputation of the child abuse enterprise.

76. The parents and caregivers subjected to child abuse prosecutions are disproportionately blue collar, low income or minority persons who lack the resources to combat prosecutions spearheaded by well-credentialed university pediatric experts.

77. Upon information and belief, as high as 80% of child abuse allegations are made against parents and caregivers at or below 100% of the poverty line while 98% are made against parents and caregivers at or below 399% of the poverty line, as established in the US Census Bureau report *Health Insurance Coverage in the United States: 2022*.

78. In fact, Defendant Harper and others recently published a multicenter study titled, *Variation in Use of Neuroimaging in the Care of Infants Undergoing Subspecialty Evaluations for*

*Abuse: A Multicenter Study,* October 28, 2024. The study self-reports that of the 1,114 infants in the study population, 72% were publicly insured (Medicaid funded Medical Assistance or partially Medicaid/State funded public health insurance) or uninsured. Upon information and belief, of the 26% studied who had private or military insurance, most of this population was also at or below 399% of the poverty line.

79.     Thus, while child abuse physicians and their related child advocacy centers regularly testify and publicly profess that child abuse spans across all social and economic levels, races, religions, and cultures, the statistics suggest a predatory interest in blue collar, low-income and minority families.

80.     Because child abuse diagnoses are partially validated by legal determinations, child abuse physicians seek out low-income caregivers that lack the financial wherewithal to significantly challenge the criminal charges and the underlying diagnoses. There is too much to lose from wealthy defendants and their legal teams deeply examining the medical records.

81.     Finally, the child abuse enterprise has become what amounts to a self-perpetuating industry. Because the funding and maintenance of university departments, endowed chairs, case workers, and prosecution teams depends on ever increasing numbers of successful prosecutions, child abuse pediatricians are pressured to continually "find" victims of child abuse in order to maintain and grow the child abuse enterprise – just like for-profit corporation CEOs are continually pressured to increase sales.

**The Medical Community Attacks the Medical Validity of the SBS/AHT Enterprise**

82.     Starting around 2000, a number of medical researchers began to question the validity of the SBS/AHT hypothesis and the overall number of child abuse prosecutions in general, prompted in large part by its excessive use and abuse by the well-funded child abuse

enterprise.

83. Up to that point, many child abuse teams were able to secure SBS/AHT type convictions based on the existence of a baby's presentation with the SBS/AHT triad alone. In other words, babies would present to an emergency room with a brain bleed, retinal bleed and brain swelling – with absolutely no outward signs of injury or abuse – yet their parents or caregivers would be successfully prosecuted because of the sophistication and organization of the SBS/AHT enterprise and the lack of studies questioning the evidentiary basis for the prosecution's medical expert testimony.

84. Around this time, several medical researchers became concerned that SBS/AHT was being overdiagnosed, and that the SBS/AHT hypothesis was resulting in a number of known false prosecutions and convictions. These false prosecutions were particularly troubling because they usually involved prosecution of the baby's parents or caregivers.

85. These medical researchers began to publish papers questioning the validity of the SBS/AHT hypothesis.

86. For example, a 2002 paper by forensic pathologist John Plunkett demonstrated, through video evidence, that a short fall from playground equipment could cause the triad of SBS/AHT symptoms and death after a short period of lucidity. This conclusion flew directly in the face of the SBS/AHT hypothesis, which was built on the idea that the triad of injuries was basically conclusive of SBS/AHT even if the infant had suffered falls or other medical injuries.

87. Other medical studies confirmed that short falls could produce the triad of symptoms as could many non-traumatic medical conditions, including genetic disorders, metabolic disorders, blood disorders, clotting disorders, infections, toxins, poisons, nutritional disorders, and surgical complications.

88.     In 2003, a prominent biomechanical study by Michael Prange showed that the amount of shaking force necessary to cause an SBS/AHT-type brain injury to an infant would also necessarily result in catastrophic neck injury. Prange's conclusion was that the triad of SBS/AHT symptoms could not be caused by shaking unless the baby also had significant damage to his neck and ligaments.

89.     In 2006, the National Association of Medical Examiners withdrew its endorsement of the SBS/AHT hypothesis, calling the triad "not scientifically valid" and "mythical."

90.     In 2009, the American Academy of Pediatrics revisited its position on SBS/AHT and found, due to advances in medical understanding, that "there is no single or simple test to determine the accuracy of the [SBS/AHT] diagnosis."

91.     In 2010, a major study was published demonstrating that the mere presence of retinal bleeding is not diagnostic of SBS/AHT. *Retinal and Optic Nerve Sheath Hemorrhages Are Not Pathognomonic of Abusive Head Injury,* American Academy of Forensic Sciences (2010).

92.     In 2011, separate studies by Lantz/Couture and Barnes demonstrated that both subdural and retinal bleeding – 2/3 of the SBS/AHT triad – could be caused by short falls, further dissembling the medical and evidentiary foundation of SBS/AHT. *See Lantz et al, Evidence Based Case Report: Perimaculer Folds From Childhood Head Trauma,* 328 Br. Med. J. 754 (2004); Patrick D. Barnes, *Imaging of Nonaccidental Injury and the Mimics Issues and Controversies in the Era of Evidence-Based Medicine*, 49 Radial. Clin. N. Am .205, 212 (2011).

93.     Barnes further noted that there is, "no evidentiary basis for reliably distinguishing between nonaccidental and accidental injury or the medical 'mimics.'"  As a result, he concluded that, "the triad of signs and symptoms that would lead to a Shaken Baby Syndrome diagnosis

were and are no longer considered medically sound."

94.　In 2012, the very person who coined the term "Shaken Baby Syndrome," Dr. Guthkelch, expressed remorse for creating what he considered to be a runaway prosecution train:

> While society is rightly shocked by any assault on its weakest members and demands retribution, there seem to have been instances in which both medical science and the law have gone too far in hypothesizing and criminalizing alleged acts of violence in which the only evidence has been the presence of the classic triad or even just one or two of its elements. Often, there seems to have been inadequate inquiry into the possibility that the picture resulted from natural causes. In reviewing cases where the alleged assailant has continued to proclaim his/her innocence, I have been struck by the high proportion of those in which there was a significant history of previous illness or of abnormalities of structure and function of the nervous system, suggesting that the problem was natural or congenital, rather than abusive. Yet these matters were hardly, if at all, considered in the medical reports.

95.　In 2017, a large study conducted by Lynøe *et al* in Sweden concluded that there is insufficient medical evidence supporting the conclusion that SBS is causative of the so-called triad of injuries.

96.　In 2018, Randy Papetti published a paper describing how unreliable the SBS/AHT diagnosis had become. *Papetti, The Forensic Unreliability of Shaken Baby Syndrome.*

97.　As a result of these and other studies as well as the recognition that the SBS/AHT enterprise had resulted in a number of false convictions and painful family separations, various medical organizations began to distance themselves from the SBS/AHT hypothesis based on the clear and emerging medical evidence against it.

98.　Even more recently, former supporters of the SBS/AHT hypothesis have begun to actively back efforts to vacate criminal convictions based on earlier, flawed opinions that the presence of the triad is indicative of abuse. Among them was Dr. Guthkelch.

99.　The crumbling medical community support for SBS/AHT resulted in some courts revisiting prior convictions that were premised on flawed and medically unsupported expert

testimony by those intimately involved in the SBS/AHT enterprise.

100.    For example, in *Roark v. Texas,* No. WR-56, 380-03, October 9, 2024, the Texas
Court of Criminal Appeals vacated Andrew Roark's March of 2000 SBS/AHT conviction in a
case involving his care of his girlfriend's 13-month-old child, BD. The child did not die but
sustained permanent brain damage. Andrew Roark was sentenced to 35 years in prison. This
ruling cites to a prior habeas finding:

> The habeas court found there was evidence presented by the State at Applicant's trial that
> shaking alone could cause the injury suffered by the child and that this injury is caused by
> shaking a child with extreme vigor that creates force similar to a high-speed motor
> vehicle accident or a fall from the second story of a building, as referenced in the
> previous section. The habeas court further found that there is no scientific validation to
> the claim that shaking alone can cause the injuries to B.D. The current science indicates
> there must be an impact. The evidence the court used to formulate this finding is based on
> changing testimony by State's witnesses in other trials and medical professionals who
> testified or provided affidavits.

The Texas Court of Criminal Appeals found, as did the habeas court, that medical science had
evolved since the time of Roark's conviction. The Court took notice of the testimonies of State
SBS/AHT experts as operating with an assumed certainty that is not commensurate with the past
twenty years of scientific advancement and the uncertainty now inherent to medical evidence
once solely attributed to SBS/AHT:

> But the jury would still hear experts on both sides arguing their position. B.D.'s injuries
> were consistent with abusive head trauma. An expert could still attest to the "consistent
> with" argument. Importantly, there would likely be no statements that it is "almost
> certainly" or "classically aligns with" a particular mechanism. This leaves the jury with
> little help. B.D.'s injuries were consistent with abusive head trauma, consistent with an
> acute-on-chronic rebleed from an accidental fall, and consistent with a spontaneous
> rebleed that had reached the tipping point where there was no more room in her skull to
> hold the fluid. The mechanism of injury is the primary evidence in the case and the jury is
> left with criminal and non-criminal alternatives that are all consistent with the evidence.

101.    In *People of the State of Michigan v. Milton Lee Lemons*, Docket No. 163939, the
Michigan Supreme Court overturned the 2005 conviction Milton Lemons on July 25, 2024. In its

opinion, the Court addressed the double standard applied to SBS/AHT physicians opining on reliable testing and models versus that provided by representatives of government commissioned agencies pertaining to automobile and consumer product safety:

> We fail to understand why there is no "analytical gap" between expert opinion testimony and biofidelic and computer models in cases involving car crashes or product liability, but when those same models are relied on by experts in cases involving SBS/AHT, there is an insurmountable analytical gap between the models and the experts' testimony.

102.    Similarly, the Wisconsin Court of Appeals reversed the conviction of Audrey Edmunds in *Wisconsin v. Edmunds,* finding that "there has been a shift in mainstream medical opinion" regarding the SBS/AHT hypothesis since Ms. Edmunds's 1997 conviction.

103.    In    *Del Prete v. Thompson,* 10 F.Supp. 3d 907 (N.D. Ill. 2014), a court similarly overturned the conviction of a caregiver accused of murdering a baby through shaking, noting that the medical support for that theory had evolved considerably since the time of her conviction.

104.    *People v. Bailey,* 144 A.D. 3d 1562 reached substantially the same result, as did *In re Pers. Restraint of Fero*, 367 P.3d 588 (Wash. App. 2015).

105.    Crumbling medical and legal support for the SBS/AHT hypothesis in recent years has threatened the lucrative and prestigious enterprise created and funded based on the SBS/AHT hypothesis.

### Child Abuse Pediatricians Respond with the "Helfer Playbook"

106.    In response to the attacks on the validity of the SBS/AHT triad as a diagnostic tool – and thus child abuse pediatrics enterprise as a whole – a group of the most active child abuse pediatricians, including Defendant Harper, created what amounts to a playbook they use to counteract the existential crisis caused by this new medical evidence.

107.    Although this playbook was initially developed for SBS/AHT cases, it was later adapted for use in nearly all types of suspected child abuse and has now become the standard

playbook used on all sorts of presenting injuries, such as brain bleeds, broken bones, connective tissue injuries, bruising and failure to thrive.

108.    Upon information and belief, the tenets and methods of this Playbook were developed at least in part by Harper and certain other child abuse pediatricians by and through their organization known as the Ray E. Helfer Society ("Helfer Society").

109.    The Helfer Society is a nonprofit organization based in Illinois. Its stated goal is to support physicians specializing in the subspecialty of child abuse pediatrics.

110.    Although much of what the Helfer Society does is legitimate, Harper and some of her associated child abuse pediatricians have used it as a tool for the exchange of fraudulent medical studies, fraudulent medical data, prosecutorial strategies and expert testimony strategies in order to keep the child abuse enterprise afloat in the face of multiple evidentiary attacks from the medical and legal communities.

111.    Harper is the Helfer Society President.  Fellow child abuse pediatricians Debra Esernio-Jenssen, MD ("Esernio-Jenssen") and Barbara Knox, MD ("Knox"), are active Helfer Society members.

112.    As described in further detail below, working with and through one another and through the Helfer Society, Esernio-Jenssen, Knox, Harper and others developed the Helfer playbook in order to sustain and grow the child abuse enterprise.

113.    Upon information and belief, some of the data, materials and ideas used by Harper and others to create, adopt and carry out the Helfer playbook are stored at, were exchanged through, or otherwise electronically reside at the Helfer Society's headquarters in Illinois and thus were transmitted through interstate wires.

114.    The Helfer playbook includes an agreed upon set of child abuse hospital and

medical policies, protocols and customs that Helfer Society members, including Harper, work to impose on major hospitals and teaching institutions.

115. These policies, protocols and customs include:

a. A policy or practice that babies or children with certain types of injuries, e.g. bone fractures, bruises, connective tissue injuries, brain bleeds or failure to thrive be automatically referred to the hospital or county's child abuse team;

b. A policy or practice that once a baby's case is referred to the child abuse team, the child abuse pediatrician leads the baby's care, even though the child abuse pediatrician is typically a non-clinical, forensic physician;

c. A policy or practice that once a baby's case is referred to the child abuse pediatrician, all medical and team collaboration ceases and no clinician is permitted to enter notes or reports in the medical record that conflict with the child abuse team's diagnoses;

d. A policy or practice that, whenever possible, once a baby's case is referred to the child abuse pediatrician, the baby is moved from the hospitalist service to the surgical or trauma service because the trauma service is not normally staffed with the same sorts of medical clinicians found in the hospitalist service, thus limiting the possibility of conflicting diagnoses from hospitalists unaware of the policy preventing documentation of differential diagnoses;

e. A policy or practice that once a baby's case is referred to the child abuse pediatrician, hospitalists and other clinicians are prohibited from providing

family members with medical information or diagnostic impressions; and

    f.      A policy or practice that the child abuse pediatrician be permitted to edit the notes and reports of other physicians to ensure that those notes and reports supported the child abuse diagnosis.

116. These policies, procedures, protocols and customs ensure that the medical evidence used in subsequent child abuse prosecutions or parental termination proceedings is free of conflicting evidence that might be used to defend the child abuse allegations.

117. These policies, procedures, protocols and customs also enable the testifying child abuse pediatrician to later testify that the hospital's entire medical staff was in agreement with the child abuse diagnosis—without having to disclose that the rest of the medical staff was prevented from documenting any disagreement.

118. These policies, procedures, protocols and customs also ensure that the medical information provided to the baby's accused family consists only of a child abuse diagnosis and not any competing diagnoses or differential diagnoses that the family could later use to defend themselves in subsequent child abuse proceedings.

119. These policies, procedures, protocols and customs also ensure that law enforcement and prosecutors are shielded from any medical evidence or information that may otherwise cause them to forbear from prosecuting the alleged abuser identified by the child abuse team.

120. Once the alleged abuser identified by the child abuse team is charged with a child abuse-related crime, the policy, practice, custom and procedure provides that the child abuse pediatrician shepherd law enforcement and the prosecutors through the civil termination of parental rights, "TPR," and criminal proceedings.

121.     If the person accused of abuse later reaches a deal with prosecutors that includes what amounts to a coerced admission of abuse in exchange for return of the baby, Harper and her Helfer Society associates use this coerced admission or plea as a data point supporting their false narrative that their child abuse diagnosis was confirmed by the accused family member.  In other words, the child abuse enterprise is perpetuated in part by prosecutors offering to return the baby if the obviously innocent family members agree to admit to some form of abuse – so that this data point can be used by Harper and other Helfer Society members as "proof" that their child abuse allegations were confirmed.

122.     Because there are many situations in which trained medical professionals refuse to omit, shade, fabricate or conceal their medical opinions from the baby's parents, law enforcement and the medical record, the Helfer playbook also depends in part on acts of extortion, bullying, threats against and retaliation against noncompliant physicians, hospital staff and child abuse workers, as described in greater detail below.

123.     In order to describe and delineate the Helfer playbook developed and honed into practice by Harper and other Helfer Society members, Plaintiffs will identify facts describing how that playbook has been used by each of these Helfer Society members in other prosecutions and child abuse matters, as these form the pattern of racketeering crimes necessary to prove Plaintiffs' civil rights, RICO, RICO conspiracy and civil conspiracy claims.

**Harper developed and implemented these fraudulent and unlawful policies, procedures and customs in Hennepin County for the purpose of manipulating medical data to support the child abuse enterprise; enrich the Defendants; and assist the HCAO in separating babies from their families and caregivers**

124.     In 2015, the Minnesota Legislature passed sweeping legislation intended to improve and fortify the state's child abuse system. The new child abuse laws came into effect in July, 2015.

125.    Those new child abuse laws created a $23.35 million Child abuse Grant to be annually distributed by the Minnesota Department of Human Services ("DHS") to county-level DHS agencies to fund expanded child abuse staffing and services.

126.    DHS allocated the funds to each county according to the following criteria:

- Child population. Fifty percent of the funds must be distributed to county agencies based on the child population residing in the county.
- Screened-in reports. Twenty-five percent of the funds must be distributed based on the number of screened-in reports of child maltreatment in the county.
- Open child abuse case management. Twenty-five percent of the funds must be distributed based on the number of open child abuse cases in the county.

127.    The child abuse grant was fixed at $23.35 million and has not increased or decreased since its implementation. In order for any county to receive more funds from this grant, it would need to demonstrate increases in child population, screened-in reports and/or open child abuse management.

128.    Because the child abuse fund is fixed, increased funding to one county requires a decrease in funding to one, some, or all other Minnesota Counties.

129.    With Minnesota's passage of its massive bill funding the identification and prosecution of child abuse, the child abuse stakeholders in the metropolitan Twin Cities, including the U of M, Bremer, Hennepin County, HCAO, HH, Fairview and UMP were under significant pressure to alter their existing programs for diagnosing and prosecuting suspected child abuse in order to take advantage of the new funding sources.

130.    These child abuse stakeholders chose Harper to run the new program.

131.    When Harper arrived in 2014, child abuse stakeholders tasked her with expanding the child abuse program at the U of M and rebuilding the programs at HH and Fairview.

132.    Bremer also directly monetized child abuse diagnoses in child fatality cases by

offering substantial financial bonuses for the identification and prosecution of child abuse.

133.   In order to accomplish the goal of monetizing child abuse diagnoses, Harper used her knowledge of and association with the Helfer Society to create the child abuse policies, procedures, customs and practices outlined above.

134.   Harper caused those child abuse policies, procedures, customs and practices to be implemented throughout U of M, UMP, Hennepin County, HH and Fairview.

135.   Harper's involvement in and leadership over Hennepin County's child abuse prosecution and civil child abuse programs brought immediate and positive financial, prosecutorial and political results to Hennepin County's child abuse stakeholders.

136.   From 2008 to 2015, an average of 1,739 children in Hennepin County were reported as alleged victims of physical abuse.

137.   In 2016—after Harper arrived and her "find something, get something" policies and procedures were put into place – 5,709 children in Hennepin County were reported as alleged victims of physical abuse, an increase of 228% over the previous eight-year average. In one calendar year, physical abuse cases in Hennepin County rose by 223%.

138.   By contrast, in 2016 the eight other metro counties – Anoka, Carver, Dakota, Ramsey, Scott, Sherburne, Washington and Wright – collectively reported only 3,804 alleged victims of physical child abuse.

139.   To put this in perspective, during this time the other eight metro counties had a collective child population of 504,807. Hennepin County's child population was only 271,399. The non-Hennepin metro counties thus reported 8 victims of alleged physical abuse per 1000 children, while Hennepin County under Harper's leadership reported 21 victims of alleged physical abuse per 1000 children. Harper thus helped Hennepin County exceed the other eight

metro counties in alleged victims of physical abuse per 1000 children by 163%

140.    By 2016, the State of Minnesota and Bremer had put in place funding incentives that were tied to the number of children that could be identified as victims of physical abuse. In the case of Bremer, these incentives upon information and belief were tied to child fatalities.

141.    This in turn resulted in entire medical and social work departments funded on the expectation that the number of physical abuse victims would continue to increase over time.

142.    The flow of money tied to physical abuse findings also spilled over into the HCAO, which had fortified its child abuse prosecution team after the 2016 explosion in physical abuse cases.

143.    In 2014, the HCAO total budget was $45,107,676. Of this number, $24,303,473 was allocated to criminal prosecution and $20,804,203 to civil matters including for juvenile court matters involving children in need of protective services ("CHIPS") and Termination of Parental Rights ("TPR") cases.

144.    In 2018, the HCAO total budget was increased to $57,166,723. The total budget increase over 2014 numbers was 27%. Of this number, $28,498,433 was allocated to criminal prosecution and $28,668,290 to civil matters including CHIPS and TPR cases. The budget for CHIPS and TPR cases rose by 38% and, for the only time in a 10-year period, exceeded the criminal budget.

145.    Moreover, upon information and belief, the policies, procedures and protocols put into place by Harper resulted in bonus payments by Bremer to the institutional defendants based on the number of prosecutions of persons accused of child abuse related deaths.

146.    In short, the financial and structural existence of Hennepin County's child abuse program, which is part of a multidisciplinary team including healthcare workers, CPS workers,

medical examiners, forensic interviewers, law enforcement, government case workers, guardians *ad litem*, HCAO civil attorneys and HCAO prosecutors, depends on Harper and her continuing financial, political and prosecutorial success.

147. Harper in turn has created, fostered and maintained her own success and the purported financial and prosecutorial success of Hennepin County's child abuse prosecution system through a combination of autocratic power, fraud, extortion, bullying, evidence manipulation and perjured testimony, consistent with the tenets of the Helfer playbook as described above.

148. Because the policies, procedures and customs described above are fraudulent, unlawful, immoral, unethical, repugnant and contrary to all reasonable medical and scientific principles, those policies, procedures and customs are by necessity concealed from public disclosure and in fact are concealed from most of the UMP hospitalists who work at HH and Fairview.

149. The institutional defendants have many specific reasons for concealing these policies, procedures and customs, including:

    a.    The policies, procedures and customs are contrary to medical and scientific methods;

    b.    The policies, procedures and customs are evidence of fraud, unlawful conduct, conspiracy, evidence tampering and racketeering;

    c.    The policies, procedures and customs violate Minnesota's consumer protection statutes;

    d.    The policies, procedures and customs violate the rights of children's parents;

e.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of concealing, fabricating, manipulating and omitting important medical evidence from the record of a suspected child abuse victim would have profound effects on Hennepin County's child abuse and child abuse system as a whole, since evidence manipulation fraudulently taints the entire law enforcement and judicial process;

f.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy or custom of concealing their denial of important or sometimes lifesaving clinical care to sick babies who are tagged with a suspected child abuse diagnosis would create a legal, financial, political and public relations nightmare for those hospitals;

g.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of preventing sick babies who are tagged with a alleged (but medically unfounded) child abuse diagnosis from accessing the clinical care their parents sought by bringing the baby to the hospital would create a legal, financial, political and public relations nightmare for those hospitals;

h.    Disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of using sick babies who are tagged with a suspected (but medically unfounded) child abuse diagnosis as forensic evidence instead of patients would create a legal, financial, political and public relations nightmare for those hospitals;

i.    Disclosure of the fact that false allegations of child abuse are lodged to

cover up medical malpractice would create a legal, financial, political and public relations nightmare for those hospitals; and

j. Disclosure of the fact that sick babies who are tagged with a suspected (but medically unfounded) child abuse diagnosis remain in the hospital for forensic evidence collection would subject HH, Fairview/Fairview to potential Medicaid/insurance fraud investigations since, upon information and belief, HH, Fairview/Fairview bill Medicaid or insurance companies for clinical care that is not actually provided in the forensic evidence gathering environment the babies are kept in.

150. Defendants' intentional and active concealment of the above policies, procedures practices and customs prevented Plaintiffs from discovering much of Defendants' wrongful and illegal conduct and methods until just recently.

151. Upon information and belief, child abuse employees of the HCAO are aware of these concealed policies, procedures, customs and practices and are aware how these concealed policies, procedures, customs and practices unconstitutionally and unlawfully taint child abuse investigations, civil child abuse suits and criminal prosecutions in Hennepin County, yet conceal this knowledge from litigants, the courts and the public.

152. Upon information and belief, employees of the HCAO actively assist and conspire among themselves and others in the child abuse system to conceal these policies, procedures, customs and practices from child abuse defendants, defense counsel, courts, juries and opposing experts because they know and understand that if these unconstitutional and unlawful policies, procedures, customs and practices were publicly disclosed, it would result in their inability to effectively prosecute civil and criminal child abuse cases and may result in the reversal of

previous child abuse convictions or parenting determinations.

153. Plaintiffs in fact only discovered Defendants' secret and concealed policies, practices, procedures and customs outlined above because of a March 24, 2025 meeting with a former UMP/U of M/Fairview pediatrician, Bazak Sharon, MD.

154. Dr. Sharon is a well-respected and well-qualified pediatrician specializing in pediatric infectious disease and immunology.

155. Dr. Sharon was on the U of M faculty and was a UMP physician practicing at Fairview for approximately 17 years.

156. During the March 24, 2025 meeting, Dr. Sharon revealed the following information about his experiences with Harper and Defendants' secret child abuse policies, procedures and customs outlined above.

157. In early January, 2022, Dr. Sharon was asked to attend the care of Baby H, who had been admitted to Fairview with feeding difficulties.

158. Although Baby H was born with a head circumference in the 30th percentile, his head circumference had grown to over the 90th percentile by the time he was admitted to Fairview. Baby H had no bruising, soft tissue injuries or any medical indicia of abuse.

159. As part of the diagnostic workup, Baby H underwent an MRI, which revealed a non-acute (older) fluid collection.

160. Dr. Sharon and Baby H's assigned neurologist, UMP and U of M physician Matthias Zinn, MD, both medically concluded and opined that the fluid collection was likely spontaneous and not the result of abuse. It was later confirmed to have been caused by a longstanding Vitamin K deficiency that made Baby H more susceptible to bleeding.

161. Dr. Zinn concluded, that as a result, "from a neurologic perspective, the most

likely etiology is spontaneous bleeding."

162.     These non-abuse diagnoses were further confirmed by Baby H's abnormally large head circumference, which the physicians determined was a reaction to the fluid collection, and not the result of repeated abuse.

163.     As part of his usual habit, routine, practice and training as a physician, Dr. Sharon documented these opinions and differential diagnoses in Baby H's electronic health record.

164.     As part of his usual habit, routine, practice and training as a physician, and as Baby H's attending physician, Dr. Sharon met with Baby H's parents and informed them of these differential diagnoses and medical opinions.

165.     At the time, Dr. Sharon was not aware of UMP/Fairview/U of M and Harper's secret and concealed policies regarding child abuse documentation outlined above.

166.     Because the presence of fluid on Baby H's brain automatically alerted the hospital's child abuse team, one of Harper's close associates, Dr. Carolyn George, was assigned to take over Baby H's care.

167.     As a direct result of the policies and customs implemented by Harper and carried out by UMP/Fairview/U of M, Dr. George immediately and without medical basis diagnosed Baby H with SBS/AHT even though there was no credible medical or factual basis for that diagnosis.

168.     As a result of this false and medically unsupported diagnosis, Baby H and his two year old brother were both separated from their parents and temporarily held at Fairview under guard.

169.     Because Dr. Sharon was Baby H's attending physician and because he knew that it was highly unlikely that Baby H's condition was caused by abuse, he attempted to intervene on

32

his patient's behalf, which was his duty as a physician.

170. Among other things, Dr. Sharon attempted to contact the Hennepin County caseworker assigned to Baby H's case, Melvina Harrell, to inform her that it was very unlikely that Baby H was a victim of abuse and that the separation of the children from their parents would cause the children to suffer irreparable harm.

171. Ms. Harrell did not return Dr. Sharon's phone calls.

172. Instead, upon information and belief, Ms. Harrell contacted Harper to complain about Dr. Sharon's interference with the child abuse prosecution of Baby H's parents and to prevent Dr. Sharon from continuing to provide the parents with medical information they could use to defend themselves in the child abuse prosecution.

173. Harper in turn contacted UMP/Fairview's Chief Medical Officer, Dr. Sameer Gupta. Upon information and belief, Harper instructed and/or pressured Dr. Gupta to remove Baby H from Dr. Sharon's care; to retaliatorily and coercively threaten and discipline Dr. Sharon for documenting opinions in the medical record that conflicted with the SBS/AHT diagnosis; and to retaliatorily and coercively threaten and discipline Dr. Sharon for telling Baby H's parents that Baby H's fluid collection was from something other than intentional abuse.

174. By that time, UMP/Fairview management had made a decision, based on pressure from Harper, to treat Baby H forensically, e.g., as a piece of prosecution evidence, as opposed to a pediatric clinical patient. Baby H was reassigned to the care of Harper and George, ensuring that his forensic workup would receive no interference from actual clinicians.

175. On January 18, 2022, Jordan Marmet, MD, Fairview Hospitalist Division Director and a manager of UMP, removed Dr. Sharon from Baby H's care team and instructed him to cease all contacts with Baby H's family. Dr. Marmet told Dr. Sharon that he didn't know the

reasons for the removal.

176.     On January 20, CMO Gupta emailed Dr. Sharon and informed him that he would be required to attend a Zoom meeting on January 21.  When asked about the subject of the meeting and whether Dr. Zinn would be attending, CMO Gupta replied that the meeting would focus on Fairview and UMP's child abuse protocols.

177.     CMO Gupta informed Dr. Sharon that he would not be permitted to invite any other attendees.

178.     On that same day, Dr. George's opinion that Baby H was a victim of SBS/AHT caused the HCAO to seek an expedited proceeding to remove Baby H and his brother from their parents.

179.     The children were both thereafter placed in unfamiliar foster environments.  Baby H's brother suffered from profound emotional distress as a result of the forced removal from his home and continues to have nightmares to this day.

180.     On January 21, 2022, Dr. Sharon attended the Zoom hearing as required by CMO Gupta.

181.     Other attendees included Harper, Dr. Marmet, Dr. Gupta, Dr. Joseph Neglia (U of M Chief of Pediatrics) and Angela Nelson, UMP's corporate attorney.

182.     The Zoom was led by Attorney Nelson, who asked Dr. Sharon whether he had legal counsel, confirming that the meeting was adversarial, disciplinary, threatening and in retaliation for Dr. Sharon's patient advocacy -- and not related to quality assurance.

183.     Since Attorney Nelson announced that the proceeding was adversarial, and that Dr. Sharon may need his own attorney, she did not act as Dr. Sharon's attorney, nor did she provide him with any legal advice.

184. CMO Gupta confirmed that the meeting was not for the purpose of quality assurance by instructing Dr. Sharon that Baby H's clinical care would not be discussed.

185. Dr. Sharon was informed by the other Zoom participants, including Attorney Nelson and CMO Gupta that he had violated several as yet undisclosed (to Dr. Sharon) UMP/Fairview/U of M policies and procedures, particularly the policy and procedure that prohibited him from documenting his clinical opinions about the causes of Baby H's brain fluid in Baby H's medical record, unless his opinions matched those of George, Harper and the child abuse team.

186. Dr. Sharon was also instructed that once the child abuse team was involved, the policy normally required the baby to be transferred out of the hospitalist service and into the surgery/trauma service and assigned exclusively to the child abuse team so that hospitalist specialties would no longer be involved in the baby's care.

187. Dr. Sharon was informed that the purpose of these secret and concealed policies was to ensure that there was a cohesive approach to the diagnosis of child abuse so that law enforcement and prosecutors will not be "confused" by the possibility the child's injuries may have been accidental or caused by a medical condition other than the abuse diagnosed by Harper's child abuse team. In other words, Dr. Sharon was told that UMP/Fairview/U of M's official policy required its physicians to refrain from collaborating in the care of patients that had been reassigned to the child abuse physician's service; that its physicians were prohibited from documenting differential diagnoses or diagnoses that conflicted with the child abuse physician's service; and that its physicians were forbidden from utilizing their training or scientific methods in child abuse cases.

188. Dr. Sharon found the meeting troubling for a number of reasons, including:

a. The fact that his employers' previously concealed policy, stated through its attorney and its CMO, was to ensure that any child marked with a diagnosis of suspected child abuse by Harper's team would stop receiving competent medical assessment and treatment by Fairview and UMP's specially trained pediatric hospitalist staff and would instead become a forensic patient of Harper's child abuse team, with little or no access to care provided by specialty physicians with an ability to diagnose or treat a condition other than child abuse; and

b. The fact that his employers' previously concealed policy, stated through its attorney and its CMO was to ignore, omit and/or conceal important medical opinions and findings so that child abuse suspects could be more easily and efficiently prosecuted civilly and criminally.

189. Dr. Sharon recognized his employers' stated policies as being fraudulent, destructive to children and families, contrary to medical ethics and dangerous to patients systemwide.

190. As a result of his grave concerns, on January 24, 2022, Dr. Sharon wrote a letter of complaint to hospital management and handed it directly to Dr. Neglia. He received no response to his concerns.

191. On February 2, Dr. Sharon was contacted by the attorney for Baby H's parents. Dr. Sharon provided the attorney with a summary of his truthful opinions based on his assessment of Baby H.

192. Shortly after, Dr. Sharon was compelled to attend yet another Zoom conference on February 15, 2022.

193.    Because Dr. Sharon understood that this Zoom conference would be another retaliatory, coercive, threatening and adversarial disciplinary conference and not a quality assurance meeting, Dr. Sharon recorded the Zoom conference on his phone.

194.    The other participants on the Zoom conference included Attorney Nelson, Harper, Dr. Marmet, Dr. Gupta, Dr. Neglia and Dr. George.

195.    The purpose of the Zoom conference was indeed not quality assurance but was rather for the purpose of intimidating and threatening Dr. Sharon into manipulating medical evidence used in child abuse prosecutions and warning him that continuing to have medical opinions that conflicted with those of Drs. George and Harper was a violation of UMP, U of M and Fairview policy.

196.    Among other things, Dr. Sharon was informed by UMP/U of M/Fairview/Fairview clinical executives and legal counsel:

a.    That Dr. Sharon's scientifically and medically supported chart note and discussions with law enforcement had caused "confusion" and "moral distress" on the part of law enforcement that Dr. George was forced to "correct."

b.    That Dr. Sharon's act of sharing his truthful and scientifically based medical opinions with Baby H's parents had caused them to become "confused" over whether they had abused their baby–which was ridiculous in light of the fact that the parents already knew that they had not abused their baby.

c.    That UMP, U of M, and Fairview's policy was to admit babies with suspected abuse to the trauma unit instead of the hospitalist unit so that they would only be seen by the child abuse pediatricians. CMO Gupta commented that the policy was to avoid continuing to clinically treat babies on the hospitalist unit because that

resulted in the baby receiving assessments from different specialties that could raise the likelihood of medical diagnoses that conflicted with those reached by the child abuse team, which is something that UMP and the hospital had a policy of avoiding, even though that policy sacrificed clinical care in favor of forensic evidence gathering.

d.  That if abuse was suspected, providing clinical care for the baby's presenting problem would interfere with the child abuse team's mission.  If clinical care was necessary, the child abuse team would only involve involvement from what were apparently hand-picked "general pediatricians" instead of clinical specialists so as to avoid obtaining clinical workups that conflicted with the child abuse diagnosis.

e.  That the UMP/U of M/Fairview policy was for the child abuse pediatricians – who were forensic doctors that did not provide clinical care – to "work backward" from the child abuse diagnosis to attempt to treat the baby's actual medical problem if that was required.

f.  That all of the baby's diagnoses in the medical record have to "line up" with the primary child abuse diagnosis as to avoid making the case difficult for law enforcement and the prosecutors;

g.  That persons who are not medical providers (e.g., jurors) will not understand why there are differing opinions in the medical record;

h.  That there has to be only one story, (e.g., diagnosis) in the medical record in order to avoid legal issues; and

i.  That the child abuse pediatrician, e.g. Harper, "drives the ship" as to diagnostic and clinical care, to the exclusion of all other physicians.

197.    On March 2, Dr. Sharon was summoned to a meeting with Dr. Neglia and Dr. Marmet. Dr. Sharon was threatened that there would be repercussions in continuing to communicate his opinions to Baby H's defense attorney.  In the event he chose to cooperate with the defense, Dr. Sharon was instructed to forward all such communications to UMP's attorneys. Upon information and belief, UMP's attorneys would then share this information with the HCAO to assist it in the civil and criminal proceedings.

198.    In May, 2023, Dr. Sharon was assigned to attend the care of Baby C.

199.    Baby C's mother, a pediatric nurse, had enrolled Baby C in a study conducted by the U of M.  As part of that study, Baby C underwent a head MRI.

200.    The head MRI revealed the presence of a small, older brain bleed.

201.    As a result of the above policies, procedures and customs created by Harper and instituted by the institutional Defendants, Baby C's brain bleed was reported to the child abuse team.

202.    Baby C was thereafter brought to Fairview. Dr. Sharon was the pediatrician on call, and was requested to consult on Baby C.

203.    After conducting a thorough assessment, including assessing for signs and symptoms of abuse, Dr. Sharon entered a note in Baby C's medical record stating that Baby C's brain bleed was not likely the result of abuse.

204.    Shortly after making that note, Dr. Sharon was fired from UMP and the U of M by Dr. Neglia.

205.    Dr. Neglia relayed to Dr. Sharon that he was being terminated for violating the previously disclosed policy that required him to manipulate medical evidence in favor of Fairview's child abuse pediatricians. Dr. Neglia stated that the termination order was directed by

Harper, even though Harper was not Dr. Sharon's supervisor or otherwise in the chain of command.

206.     Apart from the policies, procedures, customs and coercive threats and bullying tactics described above, Harper also supports and propagates her false child abuse narrative by and through the creation of false data that she uses to generate "medical studies" supporting her child abuse enterprise.

207.     As set forth above, by creating and implementing hospital policies, procedures and customs that virtually ensure that Harper and her team will be given exclusive medical control over babies admitted to the hospital with brain bleeds or similar conditions, Harper is able to singlehandedly decide, without medical or legal interference, which parents or caregivers will be charged and prosecuted for child abuse.

208.     By wielding this unchecked medical and legal power, Harper is able to ensure that if she decides that someone abused a baby, that person will lose custody of the baby and any other children in his or her household and will face a high likelihood of either going to prison or plead guilty to a lesser offense related to child abuse.

209.     The institutional defendants have also given Harper *carte blanche* to engage in what amounts to child trafficking by and through permitting her to manipulate court evidence in order to cause a baby to be taken from its parents and reassigned to another family, such as what happened to Isaac in this case.

210.     Each admission, juvenile court determination, maltreatment finding, or conviction or guilty plea creates a data point for Harper and other Helfer Society members to use to convince juries that their medical opinions are substantiated.

211.     Juries are told by Harper that the fact that most or all of the people accused of

child abuse by Harper have either been convicted or have pled guilty substantiates the medical evidence supporting her child abuse diagnosis.

212. These fraudulent data points are particularly important to Harper and members of the Helfer Society since the true medical studies – the ones that are peer reviewed and based on non-fraudulent data – demonstrate that some of their diagnoses, including the SBS/AHT diagnosis, are not legitimate.

213. Apart from the fact that Harper's academic fraud is created from the lives of those falsely accused of heinous crimes, what also makes Harper's academic fraud particularly egregious is the fact that it is sponsored by and made possible by these esteemed institutional defendants, who have chosen money and funding over truth and the protection of babies, families and concepts of medical science and teaching.

214. Another way Harper implements the Helfer Playbook throughout the Hennepin County medical community is by editing and modifying the reports of other physicians to promote and support diagnoses of SBS/AHT and other forms of child abuse.

215. In the case of *Kallie Raye Budin and Michael Jeffrey Budin*, Harper specifically admitted under oath that as a matter of policy and practice she edits and modifies reports and medical records of other physicians who have provided care to patients Harper consults on.

216. In the case of *Reynolds v. Harper et* al, Harper edited and manipulated medical records in order to make it appear as if GC had been abused by Sylwia Reynolds, even though all objective evidence proved the contrary.

217. Harper makes these edits and modifications to other physician reports without clearly identifying her edits and/or contributions. The purpose of the policy and practice of giving Harper the ability to "ghost edit" other physician reports is so Harper can craft precise medical

evidence that makes it easier to prosecute intended child abuse defendants.

218.    When she is finished with the edits, Harper gives the reports back to the physicians for them to sign and file them using their own names, in order to make it appear as if the physicians created the reports on their own and without assistance.

219.    Consistent with the Helfer playbook, Harper's editing and modification of other physician's assessments and reports necessarily requires the agreement and participation of the physicians whose reports are being edited.

220.    Harper is able to extract this agreement and participation – even though it is wrongful and unethical – precisely because Harper wields enormous power over the other physicians' professional futures and livelihoods, consistent with the way other child abuse pediatricians implement the Helfer Playbook, as described below.

221.    Another Helfer playbook tactic Harper regularly uses is to shade or actually fabricate her testimonial history in order to make it appear to criminal juries that she is unbiased and provides expert services to both the defense and prosecution, which is not the case.

222.    Upon information and belief, Harper has testified exclusively on behalf of state prosecutors in cases involving physical child abuse for over 24 years. During this time, Harper has averaged 6 to 12 court appearances as an expert witness per year, or well over 200 trial testimonies. On many of those occasions, Harper has been asked about her testimonial history.

223.    As part of her implementation of the Helfer playbook, Harper has learned how to avoid being pinned down on her history of giving expert testimony on behalf of defendants criminally charged with SBS/AHT or any other form of physical abuse of children. She does this through a combination of evading the question; answering a different question than the one asked; refusing to give actual case names; and by giving false testimony about her testimonial history.

224.     In *Minnesota v. McMorris,* for example, Harper testified under oath on December 20, 2017, that she had never testified on behalf of a defendant in a child abuse case.

225.     On July 17, 2019, Harper contrarily testified in *Minnesota v. Laurie Ann Gregor* that she gave expert testimony on behalf of a child abuse defendant while she was medical director of Driscoll Children's Hospital in Corpus Christie, Texas – which was prior to the *McMorris* testimony.

226.     On November 11, 2021, Harper testified in *Wisconsin v. Kathryn Campbell* that she had testified on behalf of child abuse defendants "probably about a half dozen or a dozen times," which is false.

227.     On January 9, 2023, Harper testified in *Minnesota v. Jordan William Carter* that she had appeared in court on behalf of child abuse defendants twice: once involving child pornography and once involving sexual assault in Pennsylvania.

228.     On December 15, 2023, Harper testified in State of *Wisconsin v. Joanna Ford* that she had only testified once for a criminal defendant, and that had been in Pennsylvania, though she was uncertain of the date.

229.     Harper and her co-employer, UMP, also arrange for Harper's expert witness fees to be paid to UMP so that Harper can falsely imply to the jury that she receives no compensation or benefit for giving her expert testimony.

230.     Harper also implements the Helfer playbook by misrepresenting accepted medical science as it pertains to accidental TBI caused by short falls and stairway falls.

231.     For example, in *State of Minnesota vs. Jordan William Carter*, 69DU-CR-20-3788, Harper testified for the prosecution that children who experience short falls and stairway falls "…have very few injuries and minor injuries."

232.     Harper knew, when she gave this testimony, that it is well established, including by and through a study by the Journal of Safety Research, that "Falls are the leading cause of nonfatal emergency department (ED) visits among children aged birth to 14 years, accounting for 2.4 million visits annually, and the leading cause of traumatic brain injury (TBI) visits for children in the 0-4 year age group… children 4 years and younger are more likely to sustain head injuries, be hospitalized, or die from falls… Studies examining injury circumstances and location in younger children, report almost twice as many children are hospitalized due to falls from furniture than from stairs, but those children who fell from stairs are more likely to sustain head injuries."

233.     In the *Carter* case, the child Jordan Carter allegedly shook fell down a flight of basement stairs to a cement floor covered by thin linoleum. The boy exhibited symptoms of traumatic brain injury shortly thereafter, which included loss of appetite, vomiting, lethargy, and unusual sleep patterns. The next day at approximately 5:35 pm, the child lost consciousness and stopped breathing. Two days later, the boy died.

234.     Through her use of the Helfer playbook, Harper was able to convince a jury that the baby's death was caused by Carter's shaking, and not by falling down a flight of stairs.

235.     Harper also implements the Helfer playbook by intentionally omitting exculpatory/exonerating medical information from her consultative reports.

236.     For example, in the *Reynolds v. Harper et al* case, Harper intentionally omitted a number of exculpatory medical facts and diagnoses from her reports and communications in order to support her fictitious child abuse diagnosis.  Among other things, Harper:

      a.     Concealed the fact of GC's fall history;

      b.     Concealed family reports of symptoms consistent with a TBI;

c.      Avoided providing differential diagnoses;

d.      Concealed the fact of GC's abnormally large head circumference;

e.      Concealed GC's genetic blood clotting disorder;

f.      Concealed the fact that GC was prescribed contraindicated medications at the hospital; and

g.      Manipulated Dr. Sarah Lucken's child abuse report without attribution.

237.    Harper has taught and continues to teach fellows of the Child Abuse Pediatrics Fellowship Program at the Center and prosecutors how to identify and omit exculpatory medical information from consultative reports and criminal complaints.

238.    For example, upon information and belief, Jada Ingalls, DO, a June, 2020 graduate of Harper's fellowship program, omitted head circumference measurement diagnostic of macrocephaly from her consultive report in *State of Minnesota vs Michelle Marie Kleindl*, 06-CR-22-196.

239.    On information and belief, Harper also implements the Helfer playbook by specifically targeting child abuse diagnoses toward blue collar, low income and minority caregivers because they lack the financial resources to effectively expose her false and fraudulent methodology.

### Debra Esernio-Jenssen, MD

240.    Esernio-Jenssen is another one of the co-conspirators and Helfer Society members who helped develop the Helfer Playbook used in turn to develop and implement the child abuse diagnosis and prosecution policies, practices and standards used by Harper, U of M, Fairview/Fairview, UMP, Bremer, HH, Hennepin County and the HCAO.

241.    Esernio-Jenssen is a close colleague and associate of Harper. Esernio-Jenssen

wrote a nomination letter for a Helfer Society Outstanding Teaching award given to Harper in 2022. Esernio-Jenssen and Harper have also presented together at numerous seminars and have shared research and publications.

242.    In order to support, further and maintain the SBS/AHT enterprise for herself and her co-conspirators, Esernio-Jenssen has employed the Helfer Playbook through a long and well-documented pattern of falsifying and shading medical documents, falsifying medical diagnoses, and rendering false testimony in order to obtain or attempt to obtain child abuse convictions.

243.    Esernio-Jenssen's overzealous, unprofessional and fraudulent work in obtaining child abuse convictions has earned her significant expert witness fees and has rewarded her with a number of prestigious academic, political and teaching hospital appointments over the years.

244.    Esernio-Jenssen was an SBS/AHT pediatrician in New York in the early 2000s. During that time, she found and caused the prosecution of numerous innocent caregivers and parents of children who were injured by accidents or underlying medical conditions.

245.    By the mid-2000s, New York courts began finding, with regularity, that Esernio-Jenssen was not an objective physician but was instead an advocate for the prosecution who was willing to falsify testimony in order to support SBS/AHT prosecutions.

246.    For example, on August 31, 2005, Judge Friedman of the Queens County Family Court found that Esernio-Jenssen's opinions in a case seemed to be racially and culturally motivated, noting, "Dr. Jenssen's emphasis on ethnic and religious issues often distasteful." Judge Friedman found, "Dr. Jenssen is a pediatrician, not a psychiatrist or qualified social worker," and therefore, "[i]t [wa]s not clear to what extent her views on the relationship between the parents and their presentation should be counted as expert."

247.    Judge Friedman also found that Ersenio-Jenssen's testimony was not credible;

that Ersenio-Jenssen lacked objectivity; and that there was no evidence of abuse, notwithstanding Ersenio-Jenssen's insistence that there was.

248. Judge Friedman found it concerning that Dr. Jenssen so rigidly rejected any alternative to her chosen scenario despite advice from her own child abuse team, "Given these movings back and forth, the Court gained the impression that Dr. Jenssen had formed an intuitive judgment, and that she would make almost any argument to back it up."

249. In December 2005, another New York family court judge, the Honorable Edwina G. Richardson, found that Esernio-Jenssen was "clearly mistaken in her diagnosis that the child suffered from subarachnoid bleeding" when in fact the child's "CAT scan was negative for subarachnoid bleeding." Judge Richardson noted that Esernio-Jenssen "made her finding of Shaken Baby Syndrome despite the fact that the child had no skull fracture, no bruises, no broken bones, no retinal hemorrhages, no other signs of abuse, neglect or trauma typically associated with Shaken Baby Syndrome, and no other suspicious conditions."

250. Similar to Judge Friedman's observations, Judge Richardson stated, "It appears to this court that Dr. Jenssen [sic] came to an initial conclusion, then worked very hard to justify and defend it. She appeared unusually invested in defending her Shaken Baby Syndrome diagnosis."

251. Remarking further on Esernio-Jenssen's lack of credibility, Judge Richardson stated, "The court had a number of serious concerns worth noting regarding the testimony presented by Dr. Jenssen [sic] in this case. Not only does the court question and discredit her medical findings in light of the highly competent and credible testimony of [another physician], but the court questions her testimony for other reasons as well."

252. According to Judge Richardson, "at a minimum, Dr. Jenssen [sic] was being unreasonably judgmental and, at worst, culturally insensitive." The court further observed "Dr.

Jenssen [sic] was unusually defensive, argumentative, and condescending to counsel who questioned her appropriately. She was also confrontational and combative in providing what should have been professional expert testimony. One would expect such a high level of emotion from a party to the proceeding or a lay witness but never from one who has testified in as many cases as Dr. Jenssen has."

253.     Judge Richardson concluded that "the child's injuries were caused by natural conditions and were not caused by violent shaking" and went so far as to proclaim that the Court could "confidently find that there was no violent shaking of the child here. That is, there was no neglect and no abuse. The parents and child are clearly part of a loving, intact family. The court finds that the parents did nothing accidentally or deliberately to hurt their baby. They did not individually or jointly hurt this baby and then try to cover up his injuries."

254.     Judge Richardson went on:

> The court is saddened by what has happened here as a result of an insufficiently substantiated accusation of Shaken Baby Syndrome. Dr. Jenssen's [sic] failure to identify and adequately rule out the various potential causes of bilateral subdural hematomas in this child, and her misdiagnosis of the child as suffering from subarachnoid bleeding, caused her to jump to many conclusions including the conclusion that the child's injuries were caused by violent shaking. There are far too many abused children in our society. This court's role is to try to ensure, to the extent possible, that children are protected from abusive and neglectful parents. It is tragic that a medical misdiagnosis and an inappropriate rush to judgment has resulted in these loving, caring, dedicated parents being separated from their sickly child.

*In the Matter of V.L.*, Docket No. NA- 20759/03, Decision and Order (Queens Cty. Fam. Ct. Dec. 21, 2005).

255.     Another New York Family Court, determined, in a written opinion dated May 19, 2009, that Esernio-Jenssen falsely diagnosed "non-accidental abuse head trauma" ("NAHT") despite clear medical evidence that the child was suffering from a brain infection (meningitis) and

opinions of multiple other physicians that the child was suffering from meningitis – and not child abuse. *In the Matter of A*., Docket No. NA-17916/08, Decision (Kings Cty. Fam. Ct. May 19, 2009).

256.     Like the other family court judges, Judge Ruiz found Esernio-Jenssen lacked credibility, "Dr. Jenssen's testimony that the child suffer[ed] from an episode of NAHT preceding his first hospital admission casts serious doubt on the reliability of her entire expert testimony." The court further found, "Three of the four medical experts who testified as to the child's diagnosis and treatment agreed, to varying degrees, the child had either viral or bacterial meningitis during his first hospitalization. Only Dr. Jenssen, Petitioner's expert during their case in chief, opined the child suffered from NAHT during this first hospitalization."

257.     Esernio-Jenssen was also named as a Defendant in no less than three federal lawsuits brought in the United States District Court for the Eastern District of New York on the basis of misdiagnosing child abuse, falsely accusing parents of child abuse, and causing the unnecessary removal of children into protective custody. Those lawsuits *are Estiverne et al v. Goodwine et al.*, C.A. No. 06-06617- NG-RLM (E.D.N.Y.); *V.S. et al v. Muhammad et al.*, C.A. 07-00213-CBA-JO (E.D.N.Y.), and *Denes Q. et al v. Caesar et al.*, C.A. 07-cv-01281-CBA-JO (E.D.N.Y.).

258.     The *V.S.* and *Denes Q.* cases were both assigned to the Honorable Dora L. Irizarry, who issued a joint decision on September 30, 2008. In that decision, Judge Irizarry found, "In both complaints, medical defendant Dr. Esernio-Jenssen is accused of reporting incorrect diagnoses of the infant's injuries that she knew or should have known to be false, or reported in reckless disregard for the truth. This accusation is supported in the V.S. matter by the additional fact that full-body X-rays she ordered for the infant T.S. did not appear to reveal any

skull fracture or brain hemorrhage despite her report to the contrary. The apparent contradiction between the outcome of the X-ray and her report raises plausible inference of bad faith that could overcome the good faith presumption."

259.     In 2010, while some of the above actions were pending, Esernio-Jenssen resigned her positions in New York and moved to Gainesville, Florida. There, she assumed the position of Medical Director of the Gainesville Service Center of the Florida Department of Children and Families ("DCF Center"). Medical services were provided to the DCF Center by the University of Florida ("UF"). Esernio-Jenssen was an employee of UF and the medical director of its child abuse team ("UF CPT").

260.     While in Florida, Esernio-Jenssen was the subject of numerous complaints, concerning, *inter alia*, her findings of alleged child abuse. See, e.g., https://www.wfmz.com/news/area/lehighvalley/a-look-at-the-history-of-dr-jenssen-the-pediatrician-accused-of-overdiagnosing-medical-child/article_f7566996-438d-11ee-8ce5-6ba6e636e457.html

261.     In January 2014, a Florida mother ("Florida Mother") brought her then 5-year old son to the DCF Center, not as a victim of abuse himself, but as a supporting witness. She was told it was a witness interview. Esernio-Jenssen interviewed the boy while the Florida Mother remained in the lobby. Separating children from parents is typical of "interviews" conducted by Esernio-Jenssen.

262.     During his interview, the boy became the victim of abuse by Esernio-Jenssen.

263.     Jenssen outrageously ordered the child to strip naked, spread eagle, and photographed his entire body, including his genitals. When the child returned to his mother after the interview, he was crying, visibly shaken, and traumatized.

264.     As a result of Esernio-Jenssen's extreme and outrageous conduct against her son, the Florida Mother notified UF, Governor Rick Scott, and also filed a formal complaint against Esernio-Jenssen and other agents of the Florida Department of Health. It was the Governor who insisted the complaint be investigated by the Office of Inspector General ("OIG").

265.     In connection with its investigation, the Florida OIG provided a Preliminary Inquiry Memorandum ("PIM"), detailing the Florida Mother's complaint and the OIG's findings. The PIM focused on the conduct of state employees and does not identify Esernio-Jenssen as a subject of the complaint in the heading, but Esernio-Jenssen's conduct is discussed throughout the PIM.

266.     Specifically, the OIG notes in the PIM that Esernio-Jenssen had been the subject of a prior complaint in January 2014 for her clinical practices – more particularly, for false allegations of child abuse related to a child who had suffered a ruptured spleen.

267.     UF thereafter reassigned Esernio-Jenssen to a non-CPT position.  Given that the entire reason for Esernio-Jenssen's presence at UF was for the identification and prosecution of child abuse, her removal from CPT was the equivalent of losing her job.

268.     Shortly after her reassignment to a non-CPT role, Esernio-Jenssen left UF and Florida entirely.

269.     In August 2014, Esernio-Jenssen moved back to the Northeast, taking a position as the director of the Lehigh Valley Health Network's ("LVHN") John Van Brakle Child Advocacy Center in Pennsylvania.

270.     Esernio-Jenssen's tenure at LVHN was marked by continuing misconduct aimed at promoting the SBS/AHT enterprise as she had done in her previous positions.

271.     The child abuse caseworkers who worked with Esernio-Jenssen at LVHN

described a toxic work environment and described Esernio-Jenssen as a bully. They characterized the atmosphere as "a frenzy" with Esernio-Jenssen verbally attacking and humiliating caseworkers who disagreed with her about her identification and diagnosis of child abuse.

272. One caseworker recalled being forced to accuse a mother of Munchausen Syndrome by Proxy after being grilled for over an hour by Esernio-Jenssen on the speaker phone – with a Case Manager, Supervisor, others present in the room – until the caseworker finally relented and said "fine." One caseworker remarked that Esernio-Jenssen "thought she was everybody-the lawyer, the cops, she was everybody."

273. While at LVHN, Esernio-Jenssen regularly exceeded the scope of her practice by writing the recommendations of how child abuse prosecutions should be handled, such as removing children from their parents.

274. On another occasion, when a caseworker disagreed with Esernio-Jenssen, Esernio-Jenssen locked herself and a child in a medical examination room and refused to come out until the caseworker agreed to file for custody.

275. According to a series of later lawsuits filed against Esernio-Jenssen, including multiple parents, patients, and co-workers complained about Defendant Esernio-Jenssen's false accusations, false and unqualified diagnoses, her bullying and autocratic behavior, and her racial insensitivity.

276. In these later lawsuits filed against Esernio-Jenssen, including from approximately 2020 to 2022, Esernio-Jenssen was placed on an internal improvement plan by LVHN because of repeated false accusations of child abuse and Munchausen Syndrome by Proxy.

277. Esernio-Jenssen's continuing misconduct eventually rose to such a level that it garnered the attention of Lehigh and Northampton County officials as well as local and national

news media beginning in the summer of 2023.

278. On August 23, 2023, the Lehigh County Controller Mark Pinsley released a 99-page report entitled, "The Cost of Misdiagnosis" ("Report"), which claimed that there is a "potential systemic overdiagnosis" of medical child abuse (also known as Munchausen Syndrome by Proxy) in the Lehigh Valley. Report at 6. More specifically, the Report stated:

> An analysis uncovered alarming statistics that the Northeast region of Pennsylvania diagnoses 40% of the state's Munchausen syndrome by proxy cases ("MSBP") (used to signify medical child abuse (MCA), despite having just 11 % of the under-18 population. This disproportionate rate points to potential systemic overdiagnosis of this rare disorder.

279. The Report also recognized a pattern in the false diagnosis of not only MSBP, but other forms of child abuse:

> This audit initially began as an investigation into the costs associated with the potential misdiagnosis of Munchausen Syndrome by Proxy. However, it quickly became apparent that the inquiry needed to include other areas, such as shaken baby syndrome, various forms of head trauma, and other rare diseases frequently misclassified as child abuse. Moreover, the reader must understand that our investigation did not reveal a few anomalies attributable to human error. Instead, our analysis showed statistical anomalies suggesting a pattern that requires further investigation.

280. Not coincidentally, this uptick in false child abuse diagnoses coincided with Esernio-Jenssen's tenure at LHVN during which she introduced a screening protocol called "Every child, every time."

281. Initially, Esernio-Jenssen's "Every child, every time" protocol was implemented to screen all trauma patients under 15 years of age, but within 9 months, it was "extended to all patients admitted to the children's hospital."

282. Troublingly, this protocol appears to have been implemented regardless of any signs of child abuse in the admitted patients and without regard to the upheaval to families caused by baseless child abuse inquiries and investigations resulting from its overzealous screening tactics.

283. News agencies quickly noticed the correlation between the overdiagnoses at LVHN and Esernio-Jenssen and her policies, and began reporting on it, as well as reporting on the heartbreaking stories of Lehigh Valley residents who were falsely accused of abuse by Esernio-Jenssen.

284. As a result of the numerous complaints and lawsuits against Esernio- Jenssen, she was removed from her position at the advocacy center.

285. Esernio- Jenssen is still active in the Ray Helfer Society and continues to maintain and further the SBS/AHT enterprise through her work as an expert witness.

**Barbara Knox, MD**

286. Knox is another co-conspirator and Ray Helfer Society member who has helped Harper Esernio-Jenssen and others develop the Helfer Playbook used to create and implement the child abuse diagnosis and prosecution policies, practices and standards used by Harper, U of M, UMP, Bremer, HH, Fairview/Fairview Hennepin County and the HCAO.

287. Knox is also a close associate of Defendant Harper.

288. Knox was previously a professor of pediatrics at the University of Wisconsin ("UW"). In that role, and similar to the way Esernio-Jenssen operated, Knox maintained, furthered and participated in the SBS/AHT enterprise by finding supposed victims of SBS/AHT and making knowingly false reports of SBS/AHT against the alleged victims' caregivers and parents.

289. Using the Helfer Playbook that she, Harper and Esernio-Jenssen helped to develop, Knox engaged in a pattern of fraudulent and extortive conduct in order to support and maintain the enterprise, including, but not limited to falsifying medical records in order to support an SBS/AHT hypothesis and resulting prosecution; bullying other physicians and colleagues into

falsifying or shading medical records or diagnoses in order to support an SBS/AHT hypothesis and resulting prosecution; and retaliating against other physicians and colleagues who refused to falsify or shade medical records in order to support an SBS/AHT hypothesis and resulting prosecution.

290.    Knox's fraudulent and extortive conduct resulted in a pattern of false accusations of child abuse against the parents and caregivers of infants under her jurisdiction in Wisconsin.

291.    Soon after arriving at the UW in 2006, Knox caused the prosecution of Jennifer Hancock, a Verona day care provider who was convicted of killing an infant in her care.

292.    Knox caused the prosecution by in part pressuring a colleague, Dr. Michael Stier, to falsely conclude that the child was abused, which in turn falsely shaded his testimony at Hancock's 2009 trial.

293.    During Hancock's post-conviction motion hearing, Stier said he felt "peer pressure" to falsely conclude that the baby suffered a skull fracture and that it was caused by abuse.

294.    Stier said he has witnessed brain bleeding similar to the child in other people who died from natural causes, accidents or drug overdoses. The baby also had a heart virus that may have contributed, Stier said.

295.    Stier was certain that the infant had no skull fracture, yet the pressure exerted on him by Knox and her other proponents of the SBS/AHT enterprise caused him to falsely testify otherwise – consistent with the Helfer Playbook engineered in part by Knox, Esernio-Jenssen and Harper.

296.    Knox also attempted to cause a false child abuse prosecution of Greg Shebesta, the father of Henry, an infant.

297. There was no medical basis for Knox's false accusation of child abuse. She made the false accusation because Henry presented to the hospital with a brain bleed, but no other evidence of abuse.

298. Knox knew that Henry suffered from a blood clotting disorder that was known to cause brain bleeds like the one with which Henry was admitted.

299. Despite this fact, Knox attempted to promote the SBS/AHT enterprise through this false accusation.

300. Knox also attempted to cause a false child abuse prosecution of the Siebold family.

301. Leo Siebold was born with several medical conditions that required close monitoring, including heterotaxy syndrome, in which the internal organs are abnormally arranged. Leo's parents were told to bring Leo to the hospital if he developed a fever over 100 degrees.

302. Leo's mother, Brenna – a third grade teacher – followed that advice and brought Leo to a Wisconsin hospital when his fever spiked.

303. In the process of attempting to place an IV and a catheter, Leo thrashed, causing him to suffer bruises and cuts. Leo also had older scars from previous medical treatments at the hospital.

304. The following day Knox, who was again attempting to "find" victims of abuse to support the SBS/AHT enterprise and her own financial and reputational wellbeing, falsely accused Brenna and her husband of abusing Leo.

305. In the process of doing so, Knox falsely represented herself as a "blood specialist" to Leo's parents, arousing suspicion in Breanna, who had talked to Leo's actual hematologist at the hospital earlier that day.

306. Knox overcame Brenna's reservations and was allowed to take additional, unnecessary blood tests from Leo.

307. Leo's parents were interviewed by the police, who instantly dismissed the allegations, concluding that Leo's bruises and other physical injuries were caused by medical staff when they attempted to place the IV and catheter.

308. Brenna told reporters afterwards that she was haunted by her family's run-in with Knox's team and wondered how less-educated parents, parents in poverty, parents who did not speak English, and parents without such strong community ties and family support could weather such accusations.

309. Knox also attempted to cause a false child abuse prosecution of Alfonzo Clayborne in support of the SBS/AHT enterprise.

310. On June 8, 2016, Alfonzo Clayborne found his 3-month-old son unresponsive in his crib. He called the baby's mother. She came home from work, and together they called 9-1-1. An ambulance took her and the baby to the hospital. Clayborne followed in his car. But once he arrived, the staff barred him from joining his family.

311. The hospital's child abuse team told authorities the baby had brain bleeding and a left leg fracture. A physician assistant told police other injuries were possible but not yet confirmed, according to the criminal complaint.

312. Then-medical director Knox had examined and diagnosed the baby. Her physician assistant, Amanda Palm, relayed Knox's diagnosis to police and told them the child's injuries were caused by intentionally inflicted trauma.

313. Authorities thereafter focused on Clayborne. A police officer and child protective services worker interviewed him. The child protective services worker was the first to tell him

news of his son's condition.

314.    A pediatric orthopedist later determined Clayborne's son never had a fracture, but "a normal variant of the distal femur," according to a court document.

315.    The baby left the hospital with a cast on his leg for a break that he never had.

316.    Clayborne was charged with first-degree reckless injury. These chargers were later dropped after independent experts reached radically different conclusions than Knox.

317.    Knox also attempted to cause a false child abuse prosecution of a Lake Mills childcare provider who fell down the stairs while holding a 4-month-old.

318.    The baby sustained a blow to the head, which briefly knocked him unconscious, while the caregiver suffered minor injuries. After scans showed the child had bleeding on his brain and hemorrhaging in his eyes, Knox declared it abusive head trauma, and the woman was charged with recklessly causing the baby harm.

319.    The court dismissed the charges during trial, finding Knox's theory unsustainable.

320.    In addition to engaging in the fraudulent and unprofessional conduct described above, and in order to further facilitate her participation in the SBS/AHT enterprise, Knox provided false and fraudulent testimony in criminal prosecutions in order to assist in obtaining wrongful convictions against parents and caregivers accused of SBS/AHT.

321.    Knox's participation in and furtherance of the SBS/AHT enterprise resulted in considerable fees for expert testimony as well as the maintenance of her national reputation and position with UW.

322.    By 2019, the UW discovered that Knox had engaged in fraudulent and unprofessional conduct in furtherance of the SBS/AHT enterprise.

323.    UW placed Knox on administrative leave on July 5, 2019, finding that Knox had

engaged in "unprofessional acts that may constitute retaliation against and/or intimidation of internal and external colleagues."

324.  Knox resigned in response to the investigation.

325.  Meanwhile, a group of Wisconsin investigative journalists determined that Knox had misdiagnosed child abuse in twelve different prosecutions and child welfare cases.

326.  Knox thereafter moved to Alaska and took on the role as the Medical Director at the child advocacy center, Alaska CARES, in November, 2019.

327.  During Knox's first year at Alaska CARES, abusive head trauma / physical abuse cases increased by 173 – 220%

328.  While in Alaska, Knox implemented the same Helfer Society-derived SBS/AHT Playbook she had used in Wisconsin, which included bullying, extortion and retaliation against colleagues in order to manufacture child abuse diagnoses as well as misdiagnosing child abuse herself.

329.  As a result of Knox's abusive and fraudulent conduct, most of the workers and professionals in the Alaska CARES child abuse program resigned their positions.

330.  Knox was placed on leave in November of 2021 during an investigation of workplace toxicity and allegations against Knox's medical judgement.

331.  Knox was forced to find a new position at the University of Florida, a position she obtained through the recommendation of Helfer Society members Lynn Sheets, MD and Esernio-Jenssen.

332.  Knox became a Clinical Professor at UF Jacksonville, assigned to the Child abuse and Pediatric Forensics division, where she teamed up with Randall Alexander, MD ("Alexander").

333.    Alexander and Tom Fallon, former Dane County Assistant DA and lead prosecutor in *State of Wisconsin vs Jennifer Hancock*, presented together at the National Center on Shaken Baby Syndrome's 16th annual conference in Orlando, Florida in 2018.

334.    Alexander and Harper co-authored Medical Response to Child Sexual Abuse in 2019.

335.    In over 18 years of work as a child abuse physician, Knox has been directly involved in at least 12 cases of diagnosed abusive head trauma that were either dismissed by prosecution, dismissed by judges, adjudicated and defendants found not guilty, or defendants were convicted under dubious circumstances and the cases are now under appeal.

### Plaintiffs' Factual Background.

336.    Maria was born with genetic clotting, bone and connective tissue abnormalities that made her predisposed to spontaneous bruising, joint clicking, and bone pain. She was seen by physicians in her native Colombia on at least six occasions related to these issues.

337.    Maria was pregnant with IR at the time she and Cristian immigrated from Colombia to Minnesota.

338.    Maria and Cristian were met at the United States border by federal authorities. They were detained.

339.    Maria was transferred through several facilities throughout the American Southwest. She was denied food and electrolytes for up to two days. She was made to sleep on a mat on the floor.

340.    Although it is (or was) the policy and practice of the federal government to release pregnant women to avoid providing prenatal care, the small federally contracted jail in Texas refused to believe that Maria was pregnant, did not offer her prenatal care, and did not offer

her pregnancy testing.

341.     Another pregnant woman at that detention center passed out from dehydration. The Texas facility thereafter offered that woman and Maria food, electrolytes, and a pregnancy test. Maria was released shortly after testing positive for pregnancy.

342.     As a result of the above conduct, Maria spent the first twenty weeks of pregnancy in transit from Colombia to Minnesota and in the process was separated from Cristian.

343.     There was no prenatal care during this period. The federal government did not offer mother prenatal vitamins, prenatal care, basic nutrition, or basic human dignity. It is likely that these conditions negatively affected IR's development.

344.     Maria sought prenatal care upon arriving in Minnesota particularly after suffering a fall. At approximately 12 weeks everything indicated a healthy pregnancy except for a 1.3 centimeter x 1.3 centimeter x 1.2 centimeter subchorionic hemorrhage. Maria also suffered from bloody mucus throughout the pregnancy.

345.     At 31 weeks, Maria's medical providers opined "pregnancy is high risk due to juvenile idiopathic scoliosis, recent immigration."

346.     Subsequently, Maria developed "Cholestasis of pregnancy (ICP)" and "Elevated liver enzymes". Of particular note is the effect of ICP on vitamin K absorption and the creation of clotting factors.

347.      Mayo Clinic recommends early delivery in the case of ICP. IR was delivered at 40 weeks and 6 days, nearly a month after Mayo clinic states is ideal in the case of ICP.

348.     At the post birth assessment IR was noted to have similar concerns with his hip joint that Maria had as a child.

349.     IR's physicians were provided with a detailed medical background at or around

the time of his birth by cesarean in March, 2023. They were aware of the co-morbidity of ICP, a family history of coagulation disorders, Maria's history of spontaneous bruising, Maria's hemorrhage and bloody mucus, and IR's clotting panels. .

350.    IR's first failure to clot occurred at 12 days old.  According to hospital records, "[IR] is 12 day old here with both parents. Mom is concerned [IR's] belly button has been bleeding and she sent some photos of blood encrusted area to the nurse in basket that I reviewed."

351.    Dr. Crespo noted, "13 day old with bleeding from detaching umbilical stump. No erythema or purulence to suggest omphalitis and infant is clinically well. Area cauterized with Silver Nitrate."

352.    On 4/27/2023 HCMC physician Dr. Lucken noted that the parents brought IR in for two clinical appointments in the month between his birth and the first appointment where non-accidental trauma was suspected. Dr. Lucken also notes that Maria brought photos showing bruises occurred spontaneously on three separate occasions over the week and a half previous.

353.    On 4/26/2023 Dr. Patel noted that IR's Albumin was mildly low. On 4/27/2023 Dr. Lucken noted: "The remainder of the labwork was also normal with the exception of the hepatic panel with elevated Alkaline phosphatase, ALT and AST. Since the elevated ALT could represent abdominal trauma, an abdominal CT was also done."

354.    Every x-ray and examination of IR has been free of any indication of soft tissue injury other than bruising.

355.    On 4/25/2023, IR's Factor IX results showed abnormally low Factor IX. Dr. Patel recommended a repeated vWD panel and a referral to the Heme clinic if any clinical concerns.

356.    Maria was highly engaged with prenatal care since arriving in Minnesota. There was no indication of chemical abuse. Cristian was also active in the pregnancy and birth. HCMC

Notes, "She is here today with her partner. They are both excited to meet their baby. Maria is feeling baby move a lot. She wonders if she can still try to have a water birth if she is getting antibiotics for the GBS. She also wonders what happens if she gets to 40 weeks and she has not gone into labor." HCMC further noted, "Maria reports getting decent rest overnight. Partner Cristian supportive at bedside"

357.     At IR's post birth five day follow up appointment Dr. Crespo noted, "Parent or caregiver concerns about infant development or behavior: no Observations of parent-child interaction (strengths): Loving." Dr. Crespo further noted, "Reassuring history = parents have not missed any appointments, they brought bruising to attention of providers, they requested more frequent appointments being new parents, their interactions/cares were observed by staff during admission."

358.     Dr. Lucken also noted the following from the appointment where the umbilical cord was cauterized, "I did speak with Dr. Crespo about the visits-she said both parents were present at the visit and were very appropriate and Dad was holding [IR] very lovingly." Dr. Lucken further noted:

> I obtained a history from [IR]'s father separately the late afternoon of 4/25. He confirmed Maria's history about the bruising, stating that they did not know how it happened but were concerned. He said that he has never handled [IR] roughly and has never seen Maria do so. He does not recall any other history of trauma, including no falls. He also stated there have been no other caregivers. When asked, he denied any physical abuse from Maria himself--she had never hit him.

359.     On 4/26, Dr. Patel similarly noted:

SUBJECTIVE: No acute overnight events. Mom stated that Isaac slept well and she has no acute concerns. Discussed with mom and dad the imaging and results obtained after initial work-up that began yesterday. Discussed that there are further teams and specialist to be involved in IR's care to rule out different causes of bruising. Both parents, seen separately, were appropriately concerned and asked many questions regarding [IR].Mom mentioned that when she was a child in Colombia she had unexplained bruising, which

was worked-up without resolution. Dad concerned about a potential new bruise on his face near the eye.

360.    On 4/28, Dr. Patel further noted:

SUBJECTIVE: NAEO. [IR] slept well and continued to feed well. Eating every 3-4 hours and waking baby up to eat. He continues to spit up with feeds, discussed this is normal. Growing and stooling well. Mom and dad had appropriate questions and concerns. Mom showed a picture of a rash [IR] had on his face yesterday, has since resolved. Axilla rash improved w/zinc oxide

361.    Maria began taking photos of the spontaneous bleeding starting with the umbilical cord that failed to clot. Maria then brought IR in because she was "concerned about bruising and she brought pictures. Per Mom, he had bruising of the back and thigh found on 4/19 and bruising of the forehead and cheek found on 4/23." An initial hematology panel indicated low clotting factor for Isaac.

362.    Based on the child abuse protocols in place at HH, Harper was called to consult on IR's injuries.

363.    Consistent with her use and development of the Helfer playbook, and due to the policies, practices and customs Harper put in place at HH, Harper took full control over IR's care and treatment and turned him into a forensic patient instead of a clinical patient.

364.    As a result, IR was thereafter deprived of the team oriented, collaborative care promised by HH, U of M and UMP in its advertisements and marketing materials.

365.    In addition – and directly contrary to HH, U of M and UMP's advertised promises – Plaintiffs were essentially cut out of IR's care and care plan.

366.    Using her Helfer playbook and the autocratic powers given to her by HH, U of M, UMP and Hennepin County, Harper falsely diagnosed IR as being a victim of child abuse at the hands of Plaintiffs without considering Maria's history, IR's prenatal difficulties and the objective

medical evidence.

367.    Harper falsely and without credible medical evidence also concluded that Plaintiffs' abuse constituted "egregious harm."

368.    Harper's conclusion of egregious harm was baseless and contrary to the facts and medical evidence.  Among other things,

>    a.    Acting in compliance with the Helfer playbook, Harper intentionally omitted Maria's genetic disorder and medical history in reaching the conclusion that IR's injuries could not have been non-accidental; and
>
>    b.    Acting in compliance with the Helfer playbook, Harper refused to consider differential medical diagnoses in reaching her conclusion.

369.    Harper thereafter worked with the HCAO to file an Expedited Termination of Parental Rights petition, "ETPR," which sought immediate and likely permanent separation of IR from Plaintiffs.

370.    Had Dr. Harper acted reasonably and truthfully and not in conformance with the dictates of the Helfer playbook--and provided the Court and HCAO with information she knew about Maria's clotting disorder, the complicated pregnancy, IR's clotting panel, the blood panel abnormalities, and the lack of soft tissue injuries – it is very likely that the case would have opened as a CHIPS case and not an ETPR, which would have resulted in more due process for Plaintiffs and IR and would have resulted in a shorter separation of the family.

371.    By intentionally and outrageously choosing to push the case as one of egregious harm, Harper and the HCAO sidestepped the protections for Plaintiffs and IR otherwise provided under 42 U.S.C.A. § 671 (15)(b) and Minn. Stat. 260.012(a).

372.    Those statutes would have required Hennepin County to use reasonable efforts to

reunify Plaintiffs with IR. Those statutes would have also forced Defendants to use reasonable efforts to determine alternative causes of IR's condition and would have provided them with time and resources to build a reasonable defense to the abuse allegations.

373.    Harper and the Hennepin County's decision to allege egregious harm in IR's case is part and parcel of an overall plan to abuse emergency proceedings in order to avoid detailed scrutiny of weak or unsubstantiated medical evidence generated by Harper's child abuse team.

374.    In fact, a federal report from the Office of the Assistant Secretary for Planning and Evaluation U.S. Department of Health and Human Services found that Minnesota is one of the quickest states to terminate parental rights with a rate of termination within 17 months at 82.8% where neighboring (and demographically similar) Wisconsin has a rate of just 31.7%.

375.    The report also notes that termination happens more quickly for infants in part because "states also find it easier to recruit adoptive parents for infants than for children at somewhat older ages."   In other words, Harper and Hennepin County are motivated to push permanent parental termination through the system as quickly as possible because newborns are much easier to place for permanent adoptions than older children.

376.    To accomplish this goal, Harper and Hennepin County use false claims of egregious abuse to circumvent normal court procedures that would otherwise uncover insurmountable problems with Harper and the institutional defendants' diagnostic procedures, lack of differential diagnoses and practices that prevent the documentation of diagnoses that compete with child abuse.

377.    Another unconstitutional consequence of Defendants' abusive use of the ETPR procedure is that the parents are not entitled to reasonable efforts to reunify with their child as regulated by  42 U.S.C. § 671-679b. This, in turn, creates a situation where the child is more

likely to be not only taken from the birth parents, but also permanently adopted by new or foster parents.

378.    Thus, Defendants' intentional abuse of the normal due process procedures designed to protect families and babies from wrongful permanent separation results in what amounts to a system of child trafficking: Harper and the institutional defendants are permitted to pluck babies from their parents and redistribute them to new parents based on false accusations of child abuse that cannot be effectively countered or tested in a court proceeding.

379.    Harper's bad faith and manipulated report of egregious abuse resulted in IR's removal from Plaintiffs on May 10, 2023.  Harper's bad faith and manipulated report of egregious abuse was ratified and adopted by HH, Hennepin County, Fairview and UMP.

380.    IR was placed in the foster care of Defendant Nicole Christenson on May 10, 2023.

381.    At the time of the foster placement, IR was still breast feeding. Plaintiffs had a strong parenting desire to raise IR on breast milk.

382.    In order to ensure that IR was properly fed and raised as intended, Maria pumped breast milk throughout the day.  The breast milk was regularly delivered to Christenson at great expense and effort.

383.    Christenson dumped Maria's breast milk without telling Plaintiffs, the court or the court-ordered visit supervisor, Sonia Reyes.

384.    Instead, Christenson surreptitiously switched IR to formula, again without informing Plaintiffs, the court or the court-ordered visit supervisor, Ms. Reyes.

385.    Meanwhile, Maria continued to dutifully pump throughout the day, reasonably believing that the milk would be given to IR as promised and intended.

386.	Upon information and belief, Christenson initially switched IR from breast milk to formula for her own personal convenience.

387.	Upon information and belief, Christenson later figured out that the surreptitious switch to formula resulted in IR becoming fussy when Maria would visit and unsuccessfully attempt to get him to latch onto her breasts.

388.	Because IR's fussiness could be used as a basis to argue that IR was afraid of his mother, Christenson withheld the fact of the switch to formula to manipulate evidence that would be used against Plaintiffs in the child abuse and later adoption proceedings.

389.	Upon information and belief, Harper knew about and/or participated in Christenson's cruel ploy of dumping the breast milk to make IR appear fussy during supervised visits.

390.	Harper and Christenson used IR's manufactured fussiness as a basis for providing the court with false factual information suggesting that IR was scared of his mother and father.

391.	Christensen also falsely told Harper that when Plaintiffs would visit IR, he "screams the whole time" is "scared" and "his 'eyes are huge.'"

392.	Harper used this false and manipulated description of IR's reaction to his mother as a basis to support her various attempts to force IR's fraudulent adoption to Christenson and later to Dillman:

> The foster mother reports that she has been told by both the transport worker and the visit supervisor that Isaac cries/screams during the entire visitation. The foster mother reports that Isaac does not demonstrate unusual fussiness, crying or screaming outside of visitation. The foster mother describes Isaac as being happy, smiling, and cries minimally when hungry or tired.

> [IR] has been the victim of severe physical abuse. [IR] is at high risk for long-term physical and emotional problems secondary to this trauma. Exposure to these adverse childhood experiences (ACEs) is known to be associated with increased risk for learning disabilities, mental health disorders as well as long-term physical health consequences. It

has been reported that [IR] cries throughout visits with parents, which can trigger injuries due to caregiver frustration. It is important that [IR]continue to engage in the birth to three program and that recommendations from the evaluation are followed.

393. Harper and Christenson's manipulation of the facts was demonstrated by a sworn statement later filed with the court by Reyes,

> [IR] was fussy for about the first two months of the visits with the parents. The first foster parents [Nurse Christenson] had switched [IR] from breast milk to formula without telling us. We didn't learn that [IR] had switched to formula until about two and a half months after starting the supervised visitation. After the switch to formula, [IR] was fussy about feeding. He wouldn't latch onto her mother's breast, and he wouldn't eat. Once we learned that he had switched to formula, the parents started feeding him formula, and visits started going much better for the next one and a half to two months.

394. During the time Christenson was dumping IR's breast milk to make him fussy, IR continued to develop the same kinds of bruising that led to Harper's original child abuse conclusion.

395. Harper knew that the presence of new bruising under the care of Christenson effectively torpedoed her child abuse opinion.

396. Because Harper takes the position that her child abuse opinions are infallible, she refused to retract her opinion that IR was a victim of child abuse so that IR could be reunited with his parents.

397. Instead, consistent with her stated position that she is incapable of falsely diagnosing child abuse, Harper doubled down and rendered the equally false and outrageous opinion that the new bruising was caused by Plaintiffs' continuing abuse, even though their limited visits with IR had been supervised and even captured on video.

398. However, because IR's new bruising at the Christenson home automatically made Christenson a potential source of abuse, IR was moved to a new foster home on July 7, 2023.

399.   Pursuant to court order, the new foster parents were required to be Spanish speaking so that IR could be exposed to the same language and culture as his parents, and so IR could be raised to know and understand the Spanish language.

400.   Defendant Jacob Christensen, acting by and through Assistant County Attorney Price, falsely represented to the court on three separate occasions that the new foster family chosen by Christensen and Hennepin County – the Dillmans – were Spanish speakers.

401.   The Dillmans in fact had informed Christensen twice, in writing, that they did not speak Spanish. Megan Dillman was a white, female pediatrician like Harper, with no Spanish background or Spanish language abilities.

402.   Upon information and belief, Dillman wanted and intended to adopt IR and in so doing, had an incentive to cause the court to terminate Plaintiffs' parental rights.

403.   On July 18, 2023, Reyes observed, noted and photographed new bruises on IR.

404.   Reyes photographed the bruises even though she had been instructed by Hennepin County only to do so with the permission of Christensen, who had not given her permission to do so.

405.   Harper saw IR on July 19.

406.   Because the presence of new bruises on IR under the care of the second foster caregiver would have proved Harper's abuse opinions wrong, Harper omitted the fact of the bruises in her report.

407.   IR developed yet another bruise on July 20, 2023.

408.   Because the second new bruise under Dillman's care would have been difficult for Harper to ignore, she instead amended her report in an attempt to discredit Reyes and explain away the photos she had taken of IR's bruising.

409. Around this same time, Harper and Dillman conspired with one another to attempt to diffuse the problems IR's new bruising posed to Harper's abuse opinion as well as Dillman's adoption prospects.

410. Harper and Dillman worked with U of M psychologist Defendant Kroupina to provide the court with a psychological opinion that IR was afraid of his parents, much like Harper had done with Christenson several weeks earlier, except this time with the backing of a well-credentialed U of M psychologist.

411. Harper and Dillman apparently believed that if Kroupina's opinion was strong enough, the court might disregard IR's new bruises in its abuse determination.

412. In order to assist in the fabrication of Kroupina's court opinion, Harper and Dillman concocted false and fabricated statements attributed to Dillman about IR's inconsolable nature during parental visits:

> Megan states the visitation supervisor has informed her that [IR] cries the duration of visits with parents and is inconsolable. Megan states she believes this is "weird" as he rarely cries while in her care. Megan states parents recently had a virtual visit with Isaac, as the visitation supervisor was unable to coordinate an in-person visit. Megan states [IR] became "upset" and cried every time parents spoke during the virtual visit and states after the visit Jayden [sic, IR] had the most "difficult" feed since being in her care. Megan states [IR] is "exhausted" after having visits with parents and states she is usually unaware if there will be a visit until the night before the visit is scheduled to occur. Megan discusses that the Guardian ad Litem, Mackenzie, is advocating for [IR] to have less visits with parents, although the judge has ordered three visits a week and the next court hearing is scheduled for November.

413. Reyes informed Christensen that the information in the medical file regarding IR being inconsolable and the parents behaving inappropriately at visits was false. Christensen did nothing to remedy these false observations and facts even though he knew that these facts were being used to terminate Plaintiff's parental rights.

414. Instead, upon information and belief, Christensen told Harper to delete notes from

the record that made her opinions look less credible.

415.  In her report, Kroupina – without meeting Plaintiffs or observing IR's reaction to them – rendered a number of fabricated and unsupportable opinions that IR was scared of Plaintiffs because they had abused him:

> [IR] is reportedly inconsolable during visitations. Members of Isaac's team, including his guardian ad litem, county social worker, prior foster parent, and current foster parents, have observed Isaac during visits with birth parents or have spoken with the site supervisor (Sonia Reyes) about Isaac's crying during the visitations. According to these individuals, Isaac cries frequently and has difficulties calming down, often crying for the duration of the visit. IR's behaviors during these visitations represent a divergence from his typical demeanor throughout the day, as he usually only cries when he is

> signaling his needs and can be consoled by his caregivers. Typically, Isaac is easily soothed by being held or having caregivers meet his basic needs (e.g., bottle, diaper change, putting him to sleep, etc.). Isaac's foster parents reported that he is typically exhausted after the visits and looks "terrified, like a different baby for 15-20 minutes after, and doesn't look like himself." For Isaac, his exhaustion is typically demonstrated through refusing to eat (i.e., chews on bottle nipple; eats 1 oz) and then falling asleep. Isaac's previous foster mother also shared concerns about the high level of distress Isaac appeared to be experiencing after visits with birth parents, as demonstrated by behaviors such as clenching his feet and hands, spitting up, and excessive sleeping.

> Mr. and Mrs. Dillman and Mr. Christensen reported that there have been numerous inconsistencies with his visitation schedule. For instance, Isaac and his biological parents require a site supervisor who speaks Spanish, but Ms. Reyes (who has been working with his case) has been inconsistently available due to professional and personal obligations. The birth parents have also adjusted or cancelled the dates and times of Isaac's visits with limited warning. Additionally, illnesses have required visits to be canceled. Due to these missed visitations, foster parents reported that there have been "make up" visitations scheduled at times outside of the the [sic] agreed-upon schedule, including weekends and evenings when he would typically be asleep. Additionally, these extra visits often occur at different locations, such as outdoors at parks.

416.  Reyes – whose duties included observing IR's interactions with his parents – refuted the basis for Kroupina's opinion in a sworn affidavit she submitted to the court.

417.  Reyes attested that IR simply did not react this way to his parents.

418. In 59 pages of visit notes prior to August 8, 2023, Reyes noted that Plaintiffs' behavior was appropriate, loving and nurturing during visits.

419. Reyes ultimately came to believe that Dillman's fabricated statements about Plaintiffs' conduct were the product of racial and cultural discrimination.

420. She supported this belief by observing that the Dillmans refused to communicate with Plaintiffs and clearly didn't want them coming around:

> The foster parents refused to communicate directly with the parents about eating times, diapers, clothing, formula changes, and doctor's appointments. From the beginning, they said that they did not want the biological parents to know their names, their address, or their phone numbers. They said they felt uncomfortable meeting with the parents, even at the doctor's visits. I have never had a case where the foster parents refused to communicate with the biological parents. This caused me to be in the middle of the communication. My supervisor expressed to the guardian ad litem that it is the role of the foster parent to communicate doctors' appointments, diapering issues, feeding times, and all of that to the parents.

> On one occasion, the foster parents sent Isaac to a four-hour visit without diapers or notifying us in advance. When I raised this issue in the group chat, Jacob Christensen said I should tell the parents to start bringing their own diapers. This upset the parents because they weren't warned that they needed to bring their diapers. I felt that the parents were reasonable in being upset.

> The foster parents would send Isaac to visits in pajamas and used clothes. They said the clothes they received from the previous foster parents were too small. The only spare clothes they would send along would be the dirty clothes from the last visit. The mother went out and purchased some new clothes for Isaac and sent them with him, but the foster parents rejected them and sent them back on the next visit. This upset the parents, which I felt was a reasonable response.

> The parents would learn about doctors' appointments not from Mr. Christensen or the foster parents but through MyChart. The parents would ask about attending doctors' appointments, but the foster parents would say that they did not feel comfortable with the parents attending without me or someone from the county present. I did not think that was reasonable because of the number of doctors and nurses that would be present.

> On one occasion, we were supposed to have a virtual makeup visit for the day that Issac had a doctor's appointment for 30-45 minutes. The foster mother cut the visit concisely to ten or fifteen minutes. She then wrote to the doctor stating that Isaac was very fussy, crying, and uncomfortable during that virtual visit. That was not true.

When the mother told Jacob Christensen what the foster parents had said via MyChart to the doctors, that message was immediately deleted from Isaac's MyChart account. My notes would disagree with that statement. It was evident that the foster mother deleted it.

I think the foster parents did not give the parents a chance. I felt that they discriminated against them either because of their culture or because of what Jacob Christensen said about the parents that biased the foster parents against the parents.

421. Harper, Dillman, and Price's efforts to completely suspend Plaintiff's visitation rights were in service of several wrongful purposes.

422. First, the lack of visitation would raise the likelihood of parental termination and adoption.

423. Second, the lack of visitation would be convenient for all parties involved, other than the parents.

424. Third, and most importantly, the lack of visitation would prevent Reyes from continuing to take photographs of the new bruises, which she already did in derogation of her directives from Hennepin County.

425. After it was presented with the Reyes affidavit and the Dillman admission that they did not speak Spanish, the court noted the misrepresentations that had been made by Hennepin County.

426. The court denied Hennepin County's motion for a suspension of visits, increased services to return IR home, and set the matter for trial.

427. In order to avoid a trial in which their false statements to the court would be a major issue, Christensen and Price offered to convert the case to a non-expedited, non-termination CHIPS case and send IR home on a trial home visit.

428. Plaintiffs performed very well and the case was closed.

429. Subsequently, after the court ordered all medical records turned over to the

parents, Harper or someone under her control deleted at least seven more letters containing Harper's false medical opinions.

430. The child abuse matter was dropped, and IR was returned to his parents after eleven months and six days of court jurisdiction.

431. Defendants' combined conduct has caused Plaintiffs and IR to suffer immeasurable emotional harm. Plaintiffs watched in horror as their baby was taken from them after they sought medical services from a medical facility that held itself out as providing compassionate, collaborative team care for babies of all cultures. They watched in horror as these caregivers lied to them and about them; dumped out IR's breast milk; and attempted to have IR taken from them permanently and adopted to a white, non-Spanish speaking family. They and IR were deprived of all reasonable due process and their constitutional rights by doctors, a county, a university system and institutional Defendants who have set themselves up as what amounts to an illegal adoption enterprise under color of state law.

432. Plaintiffs suffered loss of employment due to their inability to reconcile the visitation schedule and their work schedule. The paternal grandmother had to come from Colombia to supervise them as part of the safety plan, necessitating renting housing with two bedrooms.

433. Maria spent several months pumping breast milk which was secretly destroyed. Plaintiffs were required to purchase a car when their visits were moved arbitrarily out of the County to a neighboring county.

434. Plaintiffs spent a significant portion of their income on transportation for visits and appointments required for their case plan.

435. Having IR no longer in their care, or under a trial home visit, meant that the

parents were ineligible for aid programs that they would have been eligible for including food stamps, WIC, and county based services.

436.    The arbitrary denial of reasonable efforts based on the false assertion of egregious harm resulted in the parents not being eligible for transportation assistance until July 28, 2023. The parents were ineligible for rent assistance until the case was converted to a CHIPS case. Rent and transportation assistance are common reasonable efforts in Hennepin County.

437.    IR was harmed by the loss of spending most of his first year of life away from his parents, in the home of strangers, separated entirely from his family, language, and culture.

438.    IR's baptism into the Catholic faith was delayed by the removal. IR's timely acquisition of the Spanish language was significantly harmed. No genuine investigation into IR's actual medical condition was done or allowed by Harper.

## V.    FIRST CLAIM FOR RELIEF: VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS TO FAMILY INTEGRITY PURSUANT TO 42 U.S.C. § 1983
### Against Defendants Harper, Kroupina and Christensen

439.    Plaintiffs hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

440.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

441.    IR is a citizen of the United States and Plaintiffs were at all times within the jurisdiction of the United States.

442.    Defendants Harper, Kroupina and Christensen are persons acting under color of

state law for the purposes of 42 U.S.C.§ 1983.

443. Plaintiffs and IR have constitutional due process rights to liberty and to family integrity as guaranteed by the Fourteenth Amendment.

444. Defendants Harper, Kroupina and Christensen are not entitled to qualified immunity.

445. Investigating child abuse; causing the civil or criminal prosecution of, and participating in the investigation and civil or criminal prosecution of alleged child abusers is a governmental function that is traditionally the exclusive prerogative of the state.

446. By and through a series of private agreements and legislation, Hennepin County delegated its constitutional obligation to identify, investigate, charge and prosecute child abuse to the U of M, UMP, HH and ultimately Harper, Kroupina and Christensen.

447. Thus, for these reasons, and those discussed at length above, Defendants Harper, Kroupina and Christensen were at all times relevant hereto acting under color of state law for purposes of 42 U.S.C. § 1983.

448. Defendants Harper, Kroupina and Christensen knew of and disregarded and/or fabricated facts and evidence of IR's preexisting medical conditions and IR's parental visits in order to wrongfully and intentionally arrive a knowingly false conclusion that Plaintiffs abused IR, thereby causing IR's separation or continued separation from his parents.

449. Even after Harper, Kroupina and Christensen had been provided with conclusive and irrebuttable evidence exonerating Plaintiffs from the likelihood of child abuse, Harper, Kroupina and Christensen continued to pressure the HCAO to falsely prosecute Plaintiffs and acted in a way to cause the continued separation of IR from Plaintiffs.

450. Moreover, upon information and belief, Harper, Kroupina and Christensen were

motivated by their desire to cause IR's adoption by Dillman.

451.    Harper, Kroupina and Christensen thus knowingly and specifically intended to cause the continued interference of Plaintiffs' and IR's rights to family integrity in violation of the United States Constitution.

452.    All of Harper, Kroupina and Christensen's intentional and/or deliberately indifferent acts or omissions were conducted within the scope of their official duties and employment with the various institutional defendants, including Hennepin County.

453.    Harper, Kroupina and Christensen's constitutional violations were clearly established at the time of the violations.

454.    Harper, Kroupina and Christensen's intentional and/or deliberately indifferent acts or omissions intentionally deprived Plaintiffs and IR of due process and of their rights, privileges and liberties secured by the Constitution of the United States of America, causing them to suffer damages.

455.    As a proximate result of this unlawful conduct, Plaintiffs and IR have suffered injuries and losses, entitling them to recover compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, upset, emotional distress, loss of society, loss of companionship, and other special damages all in amounts to be proven at trial.

456.    Plaintiffs further claims attorneys' fees and costs pursuant to 42 U.S.C. §1988, as well as pre-judgment interest and costs as allowable by federal law.

457.    In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff and his family.

### VI.    SECOND CLAIM FOR RELIEF: VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS TO FAMILY INTEGRITY PURSUANT TO

## 42 U.S.C. § 1983: MONELL CLAIM
## Against Defendants Hennepin County; HH; U of M; and UMP.

458.     Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

459.     Hennepin County; U of M;  HH; UMP; with deliberate indifference to the rights of Plaintiffs, IR and other similarly situated babies, parents and caregivers of babies and young children, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that were the moving force behind Plaintiffs' false prosecutions, examples of which are set forth above.

460.     Before and at the time IR was admitted to HH – Hennepin County, UMP, the U of M; and HH, with deliberate indifference to the rights of babies, parents, caregivers of babies and young children, initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and practice of failing to monitor, coordinate the care for, and address the obvious and serious situations arising from the policies and procedures put into place by Harper. Among other things, the policies, practices, procedures and customs put in place by Harper and adopted by these defendants included:

> a.   A policy or custom that requires that suspected victims of child abuse to be admitted (or transferred) to the hospital's trauma/surgery service instead of the hospitalist service so that care will be directed by forensic child abuse pediatricians and not specialized clinicians or hospitalists capable of caring for the baby's presenting medical issues;

> b.   A policy or custom of deliberately denying a sick baby access to specialized clinical care if the baby is identified as a potential victim of child abuse;

c. A policy or custom that forbids UMP hospitalists from making entries in the medical record that conflict with a child abuse related diagnoses;

d. A policy that forbids UMP hospitalists that are not part of the child abuse service from communicating with police or child abuse workers;

e. A policy that requires UMP hospitalists to develop a cohesive approach to diagnosing a child that is a suspected victim of child abuse, e.g, that the physician must not use his independent professional medical judgment to arrive at a medical conclusion different from physicians on the child abuse service;

f. A policy that intentionally deprives sick babies from medical care and consultations to which they are entitled by law;

g. Permitting Harper to edit, modify and alter medical records of other medical providers in order to permit fabrication of medical evidence these Defendants knew and intended would be used in child abuse prosecutions;

h. Permitting Harper to use her status and position to pressure, cajole, extort and coerce other medical providers and case workers under the U of M, UMP and HH umbrella into falsifying or shading their medical records, or permitting Harper to do so on their behalf, for the purpose of fabricating medical evidence these Defendants knew and intended would be used in child abuse prosecutions;

i. Permitting Harper to alter, modify and edit notes and reports of other physicians without requiring use of the EPIC system, so as to avoid a data trail in subsequent litigation;

j.  Permitting and tolerating Harper's use of what amounts to the Helfer Playbook in securing child abuse prosecutions and convictions; and

k.  As to UMP, permitting Harper to claim that her expert witness fees are paid to UMP to make it appear to juries as if Harper is not benefiting from her expert testimony.

461.  The above conduct constitutes formally promulgated policies, well-settled customs and practices, and final decisions by county policy makers.

462.  While these policies are formally promulgated in unconstitutional form that caused the violation of Plaintiffs' and IR's 14th Amendment and fundamental right to family integrity, they also constitute custom and practice, and the purposeful decision of the county policy makers to promulgate only these policies regarding the charging and civil and criminal prosecution of alleged perpetrators of child abuse.

463.  The existence of a widespread custom of deliberate indifference to the constitutional rights of caregivers and parents of children seeking emergency medical care at HH and other Hennepin County medical institutions is another basis for this claim and lawsuit. Plaintiffs invoke this Court's jurisdiction under § 1983 to enter injunctions and any similar orders to prevent this systemic deprivation of civil rights to continue unabated in the future.

464.  As a result of this unlawful and unconstitutional conduct, Plaintiffs and IR have suffered injuries and losses, entitling them to recover compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, upset, emotional distress, loss of society, loss of companionship, and other special damages all in amounts to be proven at trial.

465.  Plaintiffs further claim attorneys' fees and costs pursuant to 42 U.S.C. §1988, as well as pre-judgment interest and costs as allowable by federal law.

466. In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiffs and IR.

## VII. THIRD CLAIM FOR RELIEF: VIOLATION OF THE RACKETEER INFLUENCED and CORRUPT ORGANIZATIONS ACT, "RICO," 18 U.S.C. § 1961 et seq. Against Defendant Harper

467. Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

468. For the purposes of this Complaint, the Hennepin County child abuse enterprise was and is a RICO enterprise as that term is defined under 18 U.S.C. § 1961(4), as the enterprise includes a group of individuals associated in fact as described in greater detail above.

469. At times relevant to this Complaint, Defendant Harper received income from a pattern of racketeering activity in which she participated in, in violation of 18 U.S.C. § 1962(a).

470. At times relevant to this Complaint, Defendant Harper maintained an interest in and control over the Hennepin County child abuse enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

471. At times relevant to this Complaint, Defendant Harper was employed by and/or associated with the Hennepin County child abuse enterprise and conducted the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

472. Defendant Harper's conduct, and the Hennepin County child abuse enterprise itself, affect interstate commerce.

473. The pattern of racketeering activity alleged herein includes, but is not limited to:

a. Multiple acts of wire fraud as defined under 18 U.S.C. § 1343 and 18 U.S.C. § 1961(1), including multiple uses of interstate wires for the

purpose of perpetuating the fraudulent schemes in which Harper and her employers bilked governmental entities and taxpayers out of money and property;

b.      Multiple acts of extortion or coercion as defined under 18 U.S.C. § 1961(1), including acts of extortion directed toward coworkers and caseworkers; and

c.      Multiple acts of evidence tampering in violation of 18 U.S.C. § 1512.

474.    Defendant Harper's pattern of racketeering activity has been continuous for at least the past 10 years.

475.    Defendant Harper's pattern of racketeering has caused Plaintiffs and IR to suffer injuries to their business and property in amounts to be determined by the jury at trial.

476.    Plaintiffs suffered loss of employment due to their inability to reconcile the visitation schedule and their work schedule. The paternal grandmother had to come from Colombia to supervise them as part of the safety plan, necessitating renting housing with two bedrooms. Mother spent several months pumping breast milk which was secretly destroyed. The parents were required to purchase a car when their visits were moved arbitrarily out of the County to a neighboring county.

477.    Plaintiffs spent a significant portion of their income on transportation for visits and appointments required for their case plan. Having IR no longer in their care, or under a trial home visit, meant that the parents were ineligible for aid programs that they would have been eligible for including food stamps, WIC, and county-based services. The arbitrary denial of reasonable efforts based on the false assertion of egregious harm resulted in the parents not being eligible for transportation assistance until July 28, 2023. The parents were ineligible for rent

assistance until the case was converted to a CHIPS case. Rent and transportation assistance are common reasonable efforts in Hennepin County.

478.     IR was harmed by the loss of spending most of his first year of life away from his parents, in the home of strangers, separated entirely from his family, language, and culture. IR's baptism into the Catholic faith was delayed by the removal. IR's timely acquisition of the Spanish language was significantly harmed. No genuine investigation into IR's actual medical condition was done or allowed by Harper.

479.     Plaintiffs further claim treble damages and attorneys fees as provided by 18 U.S.C. § 1964(c).

480.     In addition, Plaintiffs seek all equitable remedies available under 18 U.S.C. § 1964(a), including appropriate Court orders imposing reasonable restrictions on the Hennepin County child abuse enterprise; Ordering Harper's divestiture from the enterprise, including her position within Hennepin County's child abuse prosecution structure; An order prohibiting Harper from continued involvement in child abuse prosecution; and any similar orders as justice requires.

**VIII.   FOURTH CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED and CORRUPT ORGANIZATIONS ACT, "RICO,"
18 U.S.C. § 1962(d)
Against Defendants Hennepin County; U of M; HH; Otto Bremer Trust; UMP; Dillman; Kroupina, Christenson, and Jacob Christensen**

481.     Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

482.     As set forth above, Defendant Harper engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1961 *et seq.*

483.     The above-named defendants, and each of them, conspired and agreed with Harper and with one another to adopt the goal of furthering the Hennepin County child abuse

enterprise by engaging in conduct that furthered the enterprise.

484. As described above, each of the Defendants has conspired with Harper to aid, assist, abet and further her pattern of racketeering activity.

485. Kroupina, Dillman, Christenson, Jacob Christensen and Price conspired with Harper to engage in RICO violations by fabricating and falsifying medical evidence used to falsely prosecute Plaintiffs civilly and by assisting Harper in doing so.

486. Defendants Hennepin County, U of M, UMP and HH conspired with Harper to engage in RICO violations by engaging in the acts and omissions described above and by providing Harper with the power, office and title to prosecute Plaintiffs and others similarly situated; by empowering Harper to cause the fabrication and alteration of medical evidence used in child abuse civil and criminal prosecutions, including Plaintiffs'; and by implementing and enforcing the unlawful policies, procedures, practices and customs created by Harper.

487. Defendants Bremer and U of M Foundation conspired with Harper to engage in RICO violations by engaging in the acts and omissions described above and by creating the financial incentives to the other Defendants to find child abuse where it does not exist and to incentivize and monetize the false prosecution of alleged child abusers, including Plaintiffs.

488. Defendants' conspiracy to violate RICO has caused Plaintiffs to suffer injuries to their business and property in amounts to be determined by the jury at trial. Plaintiffs further claims treble damages and attorneys fees as provided by 18 U.S.C. § 1964(c) individually and in their role as next friend.

489. In addition, Plaintiffs seek all equitable remedies available under 18 U.S.C. § 1964(a), including appropriate Court orders imposing reasonable restrictions on the Hennepin County child abuse enterprise; Ordering Defendants' divestiture from the enterprise, including

Harper's position within Hennepin County's child abuse prosecution structure; An order prohibiting Harper from continued involvement in child abuse prosecution; and any similar orders as justice requires.

### IX.    FIFTH CLAIM FOR RELIEF: ABUSE OF PROCESS
### Against Defendants Harper, Kroupina, Dillman, Christenson and Jacob Christensen

490.    Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

491.    Harper, Kroupina, Dillman, Jacob Christensen and Christenson conspired with one another and others and also acted individually to cause the wrongful child abuse reports and maintenance of the civil prosecutions of Plaintiffs by and through the fabrication of medical evidence, the destruction and alteration of records, and by making knowingly false statements of fact and opinion to police, the court and HCAO prosecutors.

492.    Christensen, Price, and Dillman conspired with one another and others and also acted individually to cause the wrongful child abuse reports, maintenance of the civil prosecutions, and violation of a Court order protecting Plaintiffs by and through making knowingly false statements of fact and opinion to the court and opposing counsel.

493.    Harper, Kroupina, Dillman and Christenson caused or perpetuated the employment of a legal process against Plaintiffs not for the purpose of punishing Plaintiffs for a crime or civil wrong, but for the improper purpose of promoting their own financial, personal, academic and reputational goals.

494.    Defendants' wrongful conduct and abuse of process has caused Plaintiffs and IR to suffer the injuries, damages and losses set forth above.  Plaintiffs further seek punitive damages for Defendants' willful, wanton and fraudulent conduct individually and in their role as next

friend.

## X. SIXTH CLAIM FOR RELIEF: VIOLATION OF MINN. STAT. § 260E.08
### Against Defendant Harper and Kroupina

495.    Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

496.    Minn. Stat. § 260E.08 imposes civil penalties against any person who knowingly or recklessly makes a false report of child abuse.

497.    The statute also provides for punitive damages and attorneys fees.

498.    Defendants Harper and Kroupina made knowingly false reports accusing Plaintiffs of abusing IR. These reports were made in bad faith, thus depriving Defendants of any immunity.

499.    Plaintiffs claim actual damages, attorneys fees and punitive damages resulting from these false reports pursuant to Minn. Stat. § 260E.08(d) for themselves and for their child in their role as next friend.

## XI. SEVENTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendants UMP, HH, Hennepin County, Harper, Kroupina, Dillman, Christensen and Jacob Christensen

500.    Plaintiffs hereby incorporate all previous averments as if set forth herein.

501.    Defendants Harper, Kroupina, Dillman, Christensen, Jacob Christensen and Price's conduct, as described in detail above, was extreme and outrageous.

502.    Defendants UMP, HH and Hennepin County ratified the extreme and outrageous conduct of their agents, Harper, Kroupina, Dillman, Christensen, Jacob Christensen and Price.

503.    Defendants, and each of them, intended to cause Plaintiffs and IR severe emotional distress or otherwise acted recklessly in causing Plaintiffs and IR to suffer extreme

emotional distress.

504.     Plaintiffs and IR suffered severe emotional distress caused by Defendants' extreme and outrageous conduct in amounts to be determined by the jury at trial.

## XII.     EIGHTH CLAIM FOR RELIEF: PRIVATE ATTORNEY GENERAL/CONSUMER FRAUD UNDER MINN. STAT. § 8.31, SUBD. 3 Against Defendants Hennepin County; HH; U of M; and UMP

505.     Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

506.     At times relevant, Defendants HH, Hennepin County, U of M and UMP advertised themselves as providing the highest quality of care and services to Minnesota's pediatric population, including the children of immigrant and non-English speaking parents.

507.     These defendants promised, in widespread advertising and marketing, among other things:

    a.     Teamwork and collaboration to respectfully address the physical, emotional, cultural and spiritual needs of pediatric patients and their families;

    b.     The families we serve come from many cultural and ethnic groups. Interpreters are always available to meet the needs of our non-English speaking families. Several permanent staff members are also bilingual.

    c.     We are dedicated to meeting the physical, developmental, and emotional needs of the children in our care,

    d.     We are dedicated to making sure families are involved in and understand the hospital care being provided and we are grateful to families for trusting us with their care.

e.  We take pride in knowing that you and your child fully understand what is happening during your hospital stay, and we thank you for trusting us to care for your family.

508.  Defendants' promises, representations and advertisements were knowingly false and fraudulent at the time they were made and are nothing more than fraudulent bait and switch tactics.

509.  As set forth above, HH, U of M, Fairview and UMP bait families into bringing their sick or injured child to their facilities through promises of culturally compassionate, collaborative team care that is the finest in the Twin Cities.

510.  Once lured into its U of M/UMP staffed facility, the institutional defendants switch the care to the forensic model described above that specifically violates all of the promises made in luring the family into the facility.  The baby is taken away from the family; the family members are treated like criminals; and the baby is not provided with any of the promised collaborative, quality care.

511.  Defendants' conduct constitutes restraint of trade, consumer fraud, deceptive trade practices, and the sort of egregious, fraudulent conduct Minnesota's consumer protection legislation, including Minn. Stat. § 325D is designed to remedy.

512.  Because the conduct alleged herein chills the rights of families of babies in the Twin Cities Metropolitan Area to seek emergency and routine medical care for brain bleeds, traumatic brain injuries, broken bones, connective tissue injuries, bleeding disorders and failure to thrive, among other things, without fear of false prosecution and forced family separation; and because the Attorney General has failed or refused to act to prevent the institutional defendants' continuing restraint of trade, Plaintiffs bring this claim as private attorneys general under Minn.

Stat. § 8.31, subd. 3 to enjoin further consumer fraud.

513.     Plaintiffs further claim actual damages and attorneys fees as provided by Minn. Stat. § 8.31, subd. 3 and other statutes.

## XIII.   NINTH CLAIM FOR RELIEF: CIVIL CONSPIRACY
### Against ALL Defendants

514.     Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

515.     As set forth in detail above, Defendants agreed with one another to commit a series of unlawful acts in furtherance of a lawful goal and/or an unlawful goal by and through a series of lawful acts.

516.     In particular, Hennepin County, U of M, UMP, U of M Foundation, Bremer and HH agreed with one another and with Defendant Harper to obtain increased funding, resources and grants from Bremer and government agencies by and through finding and increasing the number of child abuse prosecutions and convictions.

517.     These defendants agreed with one another that the goal of obtaining increased funding, resources and grants from Bremer and government agencies through finding and increasing the number of child abuse prosecutions and convictions could only be accomplished through illegal and fraudulent means, including through the indictment and/or prosecution of innocent persons and by bringing baseless juvenile court actions in support of the criminal prosecutions.

518.     These defendants agreed with one another that the best method for accomplishing the goal of increased funding and resources through the indictment and prosecution of child abuse would be to adopt the policies, procedures, practices and customs developed by Harper and her collaborators at the Helfer Society, and as outlined in detail above.

519.    Defendants knew and intended that the policies, procedures, practices and customs developed by Harper and her collaborators at the Helfer Society, and as outlined in detail above were wrongful, illegal and unethical because they required the participating physicians and child abuse case workers and their attorneys to alter and fabricate medical evidence; that the alteration and fabrication of the medical evidence would take place outside of the EPIC EHR system so as to avoid a metadata trail; and that the practices implemented by Harper would necessarily result in false prosecutions and convictions.

520.    Despite their knowledge and intent that their conduct and agreement was unlawful and injurious to innocent parents and caregivers, Defendants agreed to engage in the conduct described herein in order to benefit Defendants financially, politically, academically, reputationally and personally.

521.    In addition, Defendants Harper and Dillman; Harper and Christenson; and Harper and Kroupina; Christensen and Price agreed and conspired with one another to fabricate, alter, omit and edit evidence in order to cause, continue and perpetuate Plaintiffs' false civil prosecution and to cause IR's temporary and permanent separation from Plaintiffs and to achieve Dillman's goal of permanently adopting IR.

522.    Defendants' civil conspiracy has caused Plaintiffs and IR to suffer damages, injuries and losses in amounts to be determined by the jury.  Plaintiffs further claim punitive damages stemming from Defendants' intentional and willful civil conspiracy.

### XIV.   TENTH CLAIM FOR RELIEF: REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF
### Against Defendants Harper, UMP, HH, U of M, Hennepin County, Fairview and Bremer

523.    Plaintiffs hereby incorporate each and every averment set forth herein as if each and every averment were set forth verbatim herein.

524.	28 U.S.C. § 2201 and Fed. R. Civ. P. 57 empower the Court to declare the rights and obligations of the parties, including the Defendants.

525.	Plaintiffs requests an order declaring that:

a.	Defendants' policies, procedures and protocols outlined above are unlawful and unconstitutional;

b.	Bremer's act of paying bonuses and/or additional monies to Defendants based upon "production" numbers for child abuse prosecutions is unlawful and unconstitutional;

c.	The intertwined organizational structure implemented by Hennepin County, which makes Defendants a part of the criminal and civil prosecution team and which makes Harper the *de facto* decision maker in criminal and civil prosecutions is unlawful and unconstitutional;

d.	The institutional defendants' conduct constitutes an unlawful restraint of trade; and

e.	Hennepin County's current child abuse protection and prosecution structure unduly, unfairly and unconstitutionally targets low income, minority parents and caregivers.

526.	Plaintiffs further request injunctive relief pursuant to Fed. R. Civ. P. 65 in the form of an injunction prohibiting the conduct and organizational structure identified above; prohibiting the implementation of the wrongful policies, procedures, customs and practices outlined above; and effectively unwinding the current child abuse protection and prosecution structure currently in place in Hennepin County.

## XV.	CONCLUSION

527.     For the reasons set forth herein, Plaintiffs pray that this honorable Court grant judgment in their favor and in favor of IR and following trial to a jury, award the following damages in excess of $20 million and other remedies available by law, including:

a.     Pecuniary loss, including all available economic and noneconomic loss as set forth herein;

b.     Punitive damages;

c.     Attorney's fees;

d.     Pre and post judgement interest;

e.     Treble damages;

f.     Injunctive relief;

g.     RICO remedies; and

h.     Declaratory relief;

**PLAINTIFFS REQUEST TRIAL TO A JURY.**

DATED May 29, 2025

LAW OFFICES OF J.M. REINAN

/s/ Jerome M. Reinan
_____
#24322X
Attorney for Plaintiffs
1437 High Street
Denver, CO 80218
jreinan@reinanlaw.com
303.894.0383